## HOWARD REISMAN & others[1] *vs.* KPMG PEAT MARWICK LLP.

No. 00-P-1004.

Suffolk. April 10, 2002. - January 15, 2003.

Present: LENK, KASS, & MILLS, JJ.

*Accountant. Fraud. Damages,* Fraud, Sale of stock. *Negligence,* Accountant. *Consumer Protection Act,* Accountant, Availability of remedy.

In a civil action alleging that the defendant accounting firm, which had certified a corporation's financial reports for a number of years, had committed fraud, the plaintiffs, who had entered into a "stock swap" with the corporation and had subsequently seen the value of their shares decline after the accounting firm's misstatements were revealed, were not required, for purposes of summary judgment, to demonstrate that the accounting firm's misstatements were made with the specific purpose of inducing the plaintiffs to enter into the stock swap with the corporation, where the plaintiffs had shown that they, as potential investors, were among those whom the accounting firm had reason to expect would rely upon its statements. [108-111]

Discussion of the law in Massachusetts concerning proof of causation and damages in an action alleging that reliance on a fraudulent misstatement was a substantial factor in a decision to purchase or retain stock. [111-115]

This court declined to adopt the Federal concept of "loss causation" in the context of an action alleging that shareholders' reliance on an accounting firm's fraudulent misrepresentations in a corporation's financial reports was a substantial factor in their decision to purchase that corporation's stock. [115-119]

In a civil action brought against an accounting firm, which had certified a corporation's financial reports for a number of years, the plaintiffs, who had entered into a "stock swap" with the corporation and had subsequently seen the value of their shares decline after the accounting firm's misstatements were revealed, presented sufficient facts to withstand a motion for summary judgment on their fraudulent misrepresentation claim, and were not required to rule out alternative causes other than fraud for the stock's decline in market price. [119-120]

This court concluded that *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. 491 (1998), which presents barriers to recovery for third parties seeking to hold an auditor liable for negligent misstatements in audit opinions in an annual report, did not, for purposes of summary judgment,

---

[1]Amalia Reisman, Galite Reisman, Kenneth Reisman, Talia Reisman, and Amgata Holdings Ltd.

bar liability where an auditor reaffirmed those misstatements in connection with a Form S-8 filing that was issued and circulated in the midst of a transaction in which the auditor played an active and variegated role. [121-125]

Plaintiffs alleging that an accounting firm had committed an unfair practice within the context of a sale of a business to the accounting firm's client, in which transaction the accounting firm played an active role, stated facts sufficient to establish their "significant business relationship" with the accounting firm for purposes of liability under G. L. c. 93A. [125]

CIVIL ACTION commenced in the Superior Court Department on March 14, 1997.

The case was heard by *Thomas E. Connolly*, J., on a motion for summary judgment.

*Edward T. Dangel, III* (*Jonathan L. Glover* with him) for the plaintiffs.

*Kevin J. Lesinski* (*John R. Baraniak, III*, with him) for the defendant.

LENK, J. Soon after selling their interest in Varnet Software Corporation, a family business, for shares of stock in Marcam Corporation (Marcam), a publicly traded company, the Reismans[2] saw the value of their investment take a steady and precipitous plunge. When able to do so, they sold their Marcam stock at a much reduced price. After Marcam's subsequent restatement of certain recent financial reports revealed that the prior reports had overstated Marcam's revenues, the plaintiffs sued the defendant accounting firm, KPMG Peat Marwick LLP (Peat Marwick), alleging that the firm, which had certified Marcam's financials for those years, had committed fraud, made negligent misrepresentations, and violated G. L. c. 93A. Peat Marwick was granted summary judgment on these claims, and the plaintiffs have appealed.

Although denying the allegation of fraud, Peat Marwick in its motion for summary judgment, did not challenge the Reismans' contention that it had, in effect, helped Marcam "cook the books" by issuing audit opinions for financial reports containing inaccurate information stating that the reports were "free

---

[2]We refer to the Reismans and Amgata Holdings Ltd. together as "the Reismans."

from material misstatement" and conformed with generally accepted accounting principles. Instead, it maintained that it was entitled to judgment on what it saw as undisputed material facts, because (1) it owed no legal duty to the plaintiffs, as they were not its clients, and (2) since the accounting fraud was concealed until after the Reismans had sold their Marcam stock, the Reismans could not establish the requisite causal connection between their injuries and Peat Marwick's misstatements. The Reismans contend on appeal that the entry of summary judgment in Peat Marwick's favor on all claims was improper because (1) material facts are very much in dispute and (2) the judge misconstrued applicable law. We reverse.

*Facts.* We recite, in some detail, the facts of record in the light most favorable to the Reismans, the parties opposing summary judgment. See *Attorney Gen.* v. *Bailey,* 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982); *Eck* v. *Kellem,* 51 Mass. App. Ct. 850, 851 (2001).

1. *The persons and entities involved.* At all relevant times Marcam was a public company headquartered in Newton. It developed and sold application software to manufacturing companies, and its stock was traded on the National Association of Securities Dealers Automated Quotation system (NASDAQ). The defendant Peat Marwick is a national accounting firm with offices in Boston; it, along with Peat Marwick Canada, is part of a worldwide "federation of independent firms," which is coordinated through a council. Beginning in the 1980's, Peat Marwick's Boston office performed a range of accounting and other services for Marcam, including audits of its financial statements. The Reismans are a family consisting of Howard (father), Amalia (mother), Kenneth, Galite, and Talia (children). Plaintiff Amgata Holdings Ltd. (Amgata) is a Canadian holding company whose stock is owned by Howard Reisman. Amgata and the Reismans, whom we refer to together as the Reismans, owned all the common stock of Varnet Software Corporation (Varnet), a Montreal-based company founded by Howard Reisman in 1973, which manufactured software for business applications. Before the Varnet-Marcam transaction, Peat Marwick Canada had been Varnet's auditor.

2. *Marcam's financial reports.* In 1991, Marcam effectively

took control (through an irrevocable option to purchase a controlling number of shares) of three of its European distributors, in Italy, Belgium, and the Netherlands. Howard Crossman, Peat Marwick's designated auditor for Marcam from 1991 onward, knew of this at the time it occurred. In its annual report for fiscal year 1991, Marcam reported net income of $6,053,000. In so doing, the report treated the three money-losing European operations as distributors rather than as subsidiaries. Had the losses from what were in fact the three subsidiaries been properly included on Marcam's consolidated financial statement, Marcam would have shown net income of only $3,623,000, a decline in revenue from the previous year. In the independent auditors' report included in Marcam's 1991 annual report,[3] Peat Marwick stated in essence that Marcam's financial statements were free from material misstatement.[4] According to the Reismans' expert witnesses, Crossman's failure, as chief auditor, further to question Marcam about its relationships with the "distributors" amounted to Peat Marwick's "reckless disregard" both of the facts and of its duty as an independent auditor.

In the 1992 annual report, Marcam announced another steep rise in income, this time reporting $8,361,000 in net income when its actual net income was $6,678,000. By again treating the three European operations as distributors rather than subsidiaries, Marcam kept significant losses off the bottom line. In that report, Marcam also noted "an agreement in principle" it had reached to acquire the "worldwide marketing rights" to MAPICS (manufacturing, accounting, production, and information control system) software from IBM. In fact, in October, 1992, Marcam had agreed to purchase the MAPICS software

---

[3]Financial statements are generated by a corporation's management. The auditor's duty is to express an opinion whether the financial statements conform to generally accepted accounting principles based upon audits conducted in conformance with generally accepted accounting standards. See Shore, Watching the Watchdog: An Argument for Auditor Liability to Third Parties, 53 SMU L. Rev. 387, 389 (2000).

[4]Peat Marwick's report stated that it was required to determine with reasonable assurance whether Marcam's financial statements were free from material misstatement, and concluded that the statements fairly presented the company's financial position and the results of its operations and cash flow in conformity with generally accepted accounting principles.

outright. This characterization of the MAPICS acquisition as one only of marketing rights enabled Marcam to take advantage of an amortization period much longer than that traditionally permitted for software. In its independent auditor's report, Peat Marwick, which had advised Marcam in the negotiations to purchase MAPICS, certified that these financial statements were free from material misstatement.

Marcam's audited financial statements for 1993 showed net income of $2,550,000, down significantly from the 1992 reported net income of $8,361,000. These statements appeared in the 1993 annual report after the close of Marcam's September 30 fiscal year, months after the Marcam-Varnet deal had closed in June, 1993. The true facts about Marcam's 1993 net income, however, as would subsequently be reported, were even worse: Marcam showed a net loss of $12,684,000. In other words, for fiscal years 1991, 1992, and 1993, Marcam's audited annual financial reports, before they were restated in 1994, substantially overstated its earnings.

3. *Project Snowbird.* In late 1992, Howard Reisman decided to sell some or all of Varnet, which he had built into a successful enterprise over the course of twenty years. After Marcam expressed interest in buying Varnet in the spring of 1993, the two companies entered into active negotiations. To represent himself and his family in this transaction, Reisman[5] gathered a team of professionals, including the investment banking firm of Fechtor, Detwiler & Company, Inc. (Fechtor), and the law firm of Nutter, McLennen & Fish.[6] Marcam, in turn, brought in its own team, including, as herein relevant, Peat Marwick. The deal was dubbed "Project Snowbird" because of the Canadian connection. Following the advice of Peat Marwick, Marcam insisted that the deal be structured as a pooling-of-interests

[5]It is undisputed that Howard Reisman was the sole decision maker for purposes of the transaction and that his coplaintiffs relied upon him in deciding to sell their stock to Marcam.

[6]Fechtor was responsible for providing a due diligence investigation of Marcam for Varnet. In 1995, the Reismans' attorney sent a complaint letter to the firm. Thereafter, the parties reached some type of settlement agreement. The record is silent as to whether the Reismans sued their attorneys.

transaction (i.e., a stock swap),[7] the same structure that Marcam had employed when making a number of other such acquisitions, including at least one in which Peat Marwick had involvement.

For years prior, Peat Marwick Canada had served as Varnet's accounting firm. With the Marcam deal in the offing, Varnet's chief financial officer contacted a partner at Peat Marwick's Boston office, thinking it more likely to be versed in United States tax and accounting criteria. That office appointed an advisor to sit on the Varnet side of the negotiating table at an "all-hands" meeting, notwithstanding its role as advisor to Marcam. Because of Varnet's preexisting relationship with Peat Marwick Canada and Peat Marwick's status as an "independent" public accounting firm, Howard Reisman felt "comfortable" with the advisor's presence. Although there was no letter of engagement or billing arrangement, Reisman "considered [Peat Marwick] Boston to be [his] accountants" for purposes of the transaction.[8] Because the deal was structured as a pooling-of-interests transaction, it was necessary to assess the value of the two corporations, and financial statements were accordingly among the matters discussed at the meetings between the parties. Peat Marwick and Varnet representatives met several times and Peat Marwick provided at least some advice concerning the pooling aspect of the transaction to the Varnet/Reisman team.

On May 10, 1993, Peat Marwick consented in writing to the incorporation of its earlier opinions on the Marcam financial statements in the Form S-8 Registration Statement to be filed with the Securities and Exchange Commission (SEC). Marcam filed the Registration Statement on Form S-8 with the SEC on May 14, 1993. Before that, Peat Marwick's Crossman had performed a "down-to-date" review of Marcam's financial situ-

---

[7] In a pooling transaction, the ownership interests of two companies are united by an exchange of equity securities. As of the date of the closing, the first company (here, Varnet) ceases to exist. Structuring the transaction in this manner permits the surviving company (here, Marcam), inter alia, to keep off of its balance sheet certain information that may have a negative effect on earnings.

[8] The record is silent as to any consideration given by anyone at Peat Marwick Boston to the potential conflict of interest presented by Peat Marwick Boston's role as advisor to Marcam and Varnet's preexisting relationship with Peat Marwick Canada, of which it was aware.

ation to determine whether its financial statements were still free from false and misleading statements. According to the Reismans' experts, Peat Marwick by its consent in writing represented to the public that Marcam's reports remained accurate and free from false and misleading statements to the date of the Form S-8.

On or about May 13, 1993, Marcam filed with the SEC its unaudited Form 10-Q quarterly report for the period ending March 31, 1993, signed by Marcam's chief financial officer but not by Peat Marwick. Because Marcam's performance exceeded analysts' expectations, its stock rose sharply at the time. If the MAPICS transaction had been properly accounted for as an installment purchase (rather than as merely an acquisition of marketing rights), however, Marcam's balance sheet would have shown a loss for the quarter.[9] Before filing such quarterly reports with the SEC, it was Marcam's practice to run them by Peat Marwick's Crossman, who would apply "analytical procedures" to the interim financial information of the company.

On May 12, 1993, Marcam and Varnet signed a letter of intent, with a value of $23 million placed on Varnet's stock. In deciding to go forward with the closing, Reisman "relied heavily" upon the 1991 and 1992 audited financial statements, the Form 10-Q, and the Form S-8.

All drafts of the closing documents were sent to Peat Marwick for its review and approval. In Art. IV, § 4.7, of the final Securities Purchase Agreement, Marcam represented that it had furnished the Reismans with copies of all SEC documents (including annual reports, Forms 10-Q, and Form S-8); that "[e]ach of [these] documents . . . did not contain any untrue statement of material fact" or omit a material fact necessary to make the statement "not misleading"; and that the financial statements complied with all applicable accounting requirements and were prepared in accordance with generally accepted accounting principles. In certifying that the pooling transaction met all accounting requirements, Peat Marwick indicated that

---

[9]The MAPICS sale closed on February 23, 1993. According to the Reismans' experts, $5,500,000 in expenses should have been reported on the May, 1993, Form 10-Q.

all closing documents, including the Securities Purchase Agreement, had been read.

On June 18, 1993, the deal closed, with the Reismans receiving 885,000 shares of Marcam stock in exchange for their $23 million interest in Varnet. Although Marcam stock was at the time trading publicly at $24.00 per share, its actual value, according to the Reismans' experts, was $5.75 per share. After the Reismans signed on the dotted line, and well prior to the time that Marcam issued restated financial statements for fiscal years 1991 through 1993, Marcam's publicly traded stock price began steadily to decline. The Reismans' experts suggest in this regard that sometime after the Varnet-Marcam merger, market analysts began to question the integrity of Marcam's earnings. No other explanation, such as general market conditions, for the price decline prior to the revelation in the 1994 restatement that the earlier figures were incorrect appears in the record.

The Reismans were required as a condition of the transaction to hold their Marcam stock for six months after the June 18, 1993, closing. In October, 1993, following a complaint from one of Marcam's United Kingdom affiliates, Marcam made a claim against the Reismans for indemnification (claiming that they had breached certain warranties and representations), pursuant to the Securities Purchase Agreement. By December, 1993, the market price of Marcam's stock had dropped by sixteen points. On December 21, 1993, the Reismans paid Marcam $730,000 to settle the indemnification claim, releasing any claims they had against Marcam. Around the same time, they sold to foreign investors all of their Marcam stock for $7.75 per share, receiving a total of $6,858,732.

In August, 1994, Marcam restated its financial reports for fiscal years 1991 through 1993, treating the Italy, Belgium, and Netherlands companies as subsidiaries and the MAPICS transaction as a purchase, and showing over-all losses for the period. Shortly thereafter, an investor brought a class action suit against Marcam on behalf of all investors who had purchased stock between 1991 and 1993, making essentially the same allegations as in this lawsuit. See *Abato* v. *Marcam Corp.*, 162 F.R.D. 8 (D. Mass. 1995). Having released Marcam, the Reismans were unable to join in the class action, which settled. The Reis-

mans filed an action in United States District Court against Peat Marwick; after that action was dismissed on procedural grounds, they commenced this Superior Court action.[10]

*Analysis.* The Reismans appeal from the entry of summary judgment against them on all claims, asserting that Peat Marwick has not established its entitlement to judgment as matter of law on the basis of undisputed material facts. The Reismans contend that the judge erred in viewing the facts in the light most favorable to Peat Marwick, in deciding that the material facts so viewed were undisputed, and, on the basis of those undisputed facts, in ruling that the plaintiffs had failed to establish certain aspects of their claims for fraud, negligent misrepresentation, and violation of G. L. c. 93A. The Reismans argue further that the judge misapprehended the elements that they must prove to establish their claims. We examine in turn each of the three causes of action.

1. *Fraud.* The judge determined that, in order to maintain their fraud claim against Peat Marwick, the Reismans were required to, but did not, establish two things: first, that Peat Marwick made false statements with the purpose of inducing the Reismans to enter into a transaction with Marcam; and, second, that the loss in value of the Reismans' Marcam stock, which occurred before Marcam restated its financial reports for 1991 through 1993, was caused by Peat Marwick's misrepresentations. The Reismans maintain that, in so doing, the judge misapprehended applicable law.

a. *Elements of claim for fraud.* The basic elements of a claim sounding in fraud or deceit are set forth in *International Totalizing Sys.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 431 (1990):

"[T]o recover in an action for deceit, 'the plaintiff must prove "that the defendant [or its agent], made a false representation of a material fact with knowledge of its

---

[10]In the Federal action the Reismans asserted, in addition to the claims here, a violation of § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. In ruling on the motion to dismiss, the trial judge held that the Federal claims were time-barred and, while noting that the Reismans stated State law claims, dismissed the complaint for want of subject matter jurisdiction. See *Reisman* v. *KPMG Peat Marwick LLP*, 965 F. Supp. 165 (D. Mass. 1997).

falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage." ' *Danca* v. *Taunton Sav. Bank*, 385 Mass. 1, 8 (1982) (citations omitted). See also Restatement (Second) of Torts § 525 (1977) ('One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation')."

Peat Marwick offers no Massachusetts appellate authority to support its contention that the Reismans must show that, when it made its misrepresentations, it did so with the purpose of inducing the Reismans specifically to enter the Varnet-Marcam deal. The mental state element, however, is elucidated by § 531 of the Restatement (Second) of Torts (1977) (quoted in *International Totalizing Sys.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. at 431 n.12):[11]

"One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."

To the extent that the judge required the Reismans to prove that the allegedly fraudulent actor (Peat Marwick) had actual knowledge of the specific claimant (the Reismans) and of the specific transaction (the Varnet-Marcam deal) at the times the false statements were made, he appears to have mistakenly imported the standard applicable to negligent misrepresentation

---

[11]See also Bishop, Prima Facie Case — Proof and Defense § 28.3 (4th ed. 1997):

"Although earlier cases considered a fraudulent intent as a necessary element in every actionable fraud, the more modern concept is that the plaintiff must prove either an intention to mislead, or words or conduct not consonant with fairness."

claims. Contrast *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. 491 (1998), discussed *infra* (establishing liability for negligent representation only where reliance of a limited group of persons in relation to a particular transaction is foreseen "at the moment the audit [report] is published"). See Restatement (Second) of Torts § 552 comment a ("The liability [for negligent misrepresentation] stated in this Section is likewise more restricted than that for fraudulent misrepresentation stated in § 531").

The Reismans were not required to show that Peat Marwick's misstatements were made with the specific purpose of inducing the Reismans' reliance. They could also satisfy their burden by showing, as they did, that they were among those whom Peat Marwick had reason to expect would rely upon its statements. See *International Totalizing Sys.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. at 431 n.12; Restatement (Second) of Torts § 531. Peat Marwick made the misstatements both when the financial reports were first issued and when they were reaffirmed in May, 1993. As to the former, we are of the opinion that an accounting firm that, in its role as auditor, falsely certifies a company's annual report as being free from material misstatement has reason to expect at the time it so certifies that its statement will be relied upon by potential investors; this is particularly so when it is aware that there is a limited subgroup of investors — those whose companies its client company wishes to acquire — to whom such financial reports will, in all likelihood, be furnished. See Restatement (Second) of Torts § 531 comments c,[12] d,[13]

---

[12]Section 531 comment c states:

"*c. Intended results.* A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct. . . . Thus one who believes that another is substantially certain to act in a particular manner as a result of a misrepresentation intends that result, although he does not act for the purpose of causing it and does not desire to do so."

[13]Comment d reads in part:

"One has reason to expect a result if he has information from which a reasonable man would conclude that the result will follow or would govern his conduct upon the assumption that it will do so."

e,[14] & illus. 4.[15] As to the reaffirmation in May, 1993, we think reliance is especially predictable where the accounting firm affirms or reaffirms the substance of its audit opinion contemporaneously with its knowledge that these statements are being relied upon by a specific investor in regard to a specific transaction in which the accounting firm that had previously performed the audits actively participates, albeit in a multifaceted role. In this regard, the record contains facts, aspects of which are disputed to be sure, but sufficient, when inferences are drawn in favor of the plaintiffs, to indicate that Peat Marwick knew that the Reismans received the audited Marcam financials and SEC filings; that it advised the Reismans on the pooling aspect of the transaction; and that it was aware that Marcam's audited financials had been used in past pooling transactions and would most likely be relied upon in this transaction. Peat Marwick was accordingly not entitled to summary judgment on the fraud claim on this basis.

Peat Marwick maintains that it is nonetheless entitled to summary judgment on the fraud claim because the judge correctly determined that the Reismans had not shown that their post-transaction loss was caused by Peat Marwick's misrepresentations. The view of causation that Peat Marwick advocates and the judge embraced is the concept of "loss causation" that originated in the Federal securities fraud context and would require the Reismans to prove not only that they entered the deal in reliance on Peat Marwick's misrepresentation and were injured thereby, but also that the posttransaction decline in the value of their Marcam shares was itself caused by Peat Mar-

---

[14]Comment e reads in part:

> "The maker may have reason to expect that his misrepresentation will reach any of a class of persons, although he does not know the identity of the person whom it will reach or indeed of any individual in the class."

[15]Illustration 4 states that a certified public accountant who fraudulently certifies an erroneous balance sheet for B company and learns that the company will show it to one or more lenders for purposes of obtaining a loan, although the accountant does not know the identity of any of the lenders, is liable to a lender which in reliance on the balance sheet makes a loan to B and suffers loss as a result.

wick's fraud. The Reismans contend that proof of such causation is not required to make out a claim of common-law fraud under Massachusetts law and that they need only show — and have shown — that Peat Marwick's false statements were a substantial factor in their decision to purchase the stocks and that their pecuniary losses "flow[ed] naturally," *David* v. *Belmont*, 291 Mass. 450, 453 (1935), from Peat Marwick's fraud.

It has long been the law in Massachusetts that, where reliance on a fraudulent misstatement is a substantial factor in the decision to purchase and/or retain stock, the maker of a false representation is liable for a subsequent loss in the value of stock suffered in reliance on the false representation. See *David* v. *Belmont*, 291 Mass. at 452. See also *International Totalizing Sys.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. at 432 n.13. This is also the position adopted in the Restatement (Second) of Torts § 546 (1977):

> "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss."

In *David* v. *Belmont*, 291 Mass. at 452-453, the plaintiff was induced by the false representation of the defendant broker to hold shares of stock he had planned to sell and to buy additional shares. The court stated, "Where a plaintiff suffers pecuniary injury by the fraud of a defendant, the damages recoverable are those which naturally flow from the fraud." *Id.* at 453. The court elucidated: "If the defendant fraudulently induced the plaintiff to refrain from selling his stock when he was about to sell it, he did him a wrong, and a natural consequence of the wrong for which he was liable was the possibility of loss from diminution in the value of the stock, from any one of numerous causes. Most, if not all, of the causes which would be likely to affect the value of the stock, would be acts of third persons, or at least conditions for which neither the plaintiff nor the defendant would be primarily responsible. . . . The defendant, if he fraudulently induced the plaintiff to keep his stock, took the risk of all such changes [in value]. . . . The

risk of a fall, from whatever cause, is presumed to have been contemplated by the defendant when he falsely and fraudulently induced the plaintiff to retain his stock." *Id.* at 453, quoting from *Fottler* v. *Moseley*, 185 Mass. 563, 565-566 (1904).[16] "In such cases, as in other cases of tort, the rule of damages is one to compensate the party for the loss suffered by the wrong which has been done." *David* v. *Belmont*, 291 Mass. at 453. Similarly, the court held, since the plaintiff relied on the misrepresentation in buying the additional shares (and held the shares in reliance on the representation before its falsity was discovered), he was entitled to be compensated for the loss suffered as a result of the reliance on the false representation in purchasing the shares. *Id.* at 454. The loss that the plaintiff suffered and for which he was entitled to be compensated was "manifestly the difference between the then value [when the misrepresentation was revealed] and the price he paid." *Ibid.*

Such a loss is "legally attributable to the fraud," *Fottler* v. *Moseley*, 179 Mass. 295, 299 (1901), *S.C.*, 185 Mass. 563 (1904), because the loss occurred as a result of action or inaction taken in reliance on a false representation, the action or inaction was the "direct, natural and intended result" of the false representation, *Fottler* v. *Moseley*, 179 Mass. at 299-300, and the reliance was a substantial factor in bringing about the loss. See *id.*; *David* v. *Belmont*, 291 Mass. at 453-455. See also Restatement (Second) of Torts §§ 546, 548A. That other factors — in the case of stocks or bonds, general economic or market conditions — might also have contributed to the loss does not preclude recovery, so long as the reliance on the false

[16]In *Fottler* v. *Moseley*, 179 Mass. 295 (1901), *S.C.*, 185 Mass. 563 (1904), the plaintiff had ordered the defendant-broker to sell his stock, but, as a result of false statements made by the broker, the plaintiff canceled the sale and kept his stock, which later dropped in price. In the first case, 179 Mass. at 299, the court remanded the matter on the issue of causation, stating, "As to whether the loss suffered by the plaintiff is legally attributable to the fraud . . . we cannot decide . . . as a matter of law. If the fraud operated on the plaintiff's mind continuously, up to the time of the depreciation of the stock in June, 1893, so that he kept his stock when otherwise he would have sold it, and such was the direct, natural and intended result, then we think the causal relation between the fraud and the loss is sufficiently made out." On appeal after a second trial, the court, 185 Mass. at 565-566, rejected the argument that a corporate officer's embezzlement "should be treated as a new and independent cause of the loss," which would relieve the defendant of liability.

representation was an operating factor. See *David* v. *Belmont*, 291 Mass. at 455 ("Just what factors might have affected the market value of these shares in this case does not alter or change the position of the plaintiff in his right to be compensated"); *Saunders* v. *Goodman*, 8 Mass. App. Ct. 610, 616 (1979).[17] Such a loss is a foreseeable result of the false representation, see *David* v. *Belmont*, 291 Mass. at 453; see also Restatement (Second) of Torts § 548A and discussion *infra* at 118 n. 22, and it is a loss that "naturally flows from" the false representation. *David* v. *Belmont, supra.* Compare *Poly* v. *Moylan*, 423 Mass. 141, 149 (1996), cert. denied, 519 U.S. 1114 (1997) (damages of cost of filing fee for Federal court action did not "flow from" attorney's misrepresentation or deceit in failing to inform the plaintiff that Federal action had been dismissed; other damages also did not flow from alleged deceit, as dismissal of Federal claim was not result of deceit).

b. *Damages.* Thus, where a person has been induced to purchase shares of stock in reliance on a false representation, the measure of damages is the difference between the price paid and the value of the item received, as measured by the market value of the shares at the time the misrepresentation has been discovered. See *Whiting* v. *Price*, 172 Mass. 240, 242-243 (1898) (Holmes, J.); *David* v. *Belmont*, 291 Mass. at 452-455; Restatement (Second) of Torts § 549 & comment c. This means that the jury is allowed to take subsequent events into account (i.e., as reflected in the market price after the falsity of the representation has been revealed) in arriving at the actual value of the shares at the time of purchase, which is then compared to and subtracted from the price paid. *Whiting* v. *Price*, 172 Mass. at 242-243.[18]

The value is measured by the price set by the market at the time of the discovery of the misrepresentation without an at-

---

[17] In *Saunders* v. *Goodman*, 8 Mass. App. Ct. at 616, the court stated:

"That other factors may also have contributed to the loss is not material so long as the [misrepresentation] . . . was an operating factor. *Hotaling* v. *A.B. Leach & Co.*, 247 N.Y. 84, 92-93 (1928) (out-of-pocket loss caused by concealed weakness of investment plus demoralized market conditions)."

[18] Justice Holmes drew this analogy in *Whiting* v. *Price, supra*: "The

tempt to separate out general market conditions or other factors in the market that may also have contributed to a decline in price. See *David* v. *Belmont*, 291 Mass. at 455; *Saunders* v. *Goodman*, 8 Mass. App. Ct. at 616; Restatement (Second) of Torts § 549 comment c ("the mere fact that the subsequent changes in . . . financial or business conditions are factors which, in conjunction with the falsity of the misrepresentation, contribute to diminish or increase the market price of the securities does not prevent the price from fixing the value that determines the loss for which the person defrauded is entitled to recover").

There appear to be several reasons underlying this rule: (1) the purpose is to make the plaintiff whole for any loss suffered, see *David* v. *Belmont*, 291 Mass. at 454; see also *Rice* v. *Price*, 340 Mass. 502, 509 (1960) ("[s]uch damages are recoverable as will make the plaintiff whole under the circumstances"); (2) the possibility of such loss is considered to have been foreseeable by the maker of the misrepresentation at the time of making it ("[a] natural consequence of the wrong for which [the defendant] was liable was the possibility of loss from diminution in the value of stock . . . ," *David* v. *Belmont*, 291 Mass. at 453), and it is thought to be fairer that the maker of the false representation bear the loss rather than the person deceived; (3) the fact that the condition of a company is less good than represented may also cause the company to be less able to withstand depressed or poor economic conditions than if its assets had been as actually represented, see Restatement (Second) of Torts § 549 comment c; and (4) it is difficult to separate out the effects of general market conditions from those of the false representation.[19]

Further, the fact that the false representation is not revealed

subsequent events coming out may be likened to the coming out of a latent disease existing in a horse at the time of a fraudulent sale . . . ." *Id.* at 242-243.

[19]The Restatement (Second) of Torts § 549 comment c notes also that the price at the time of the initial sale may be inflated, not just by the misrepresentation in question, but also "due to the widespread belief of other buyers in misrepresentations similar to that made to the person seeking recovery, as when the market price of securities . . . is the result of widely

until after the shares have been sold does not defeat the right to recovery of the person deceived.[20] See Restatement (Second) of Torts § 549 comment c: "If the plaintiff has resold the securities in the interim, . . . his loss is the difference between the price paid and that received."

c. *Loss Causation.* Peat Marwick, recognizing that the Reismans have made a sufficient showing under the standard of *David* v. *Belmont, supra,* to survive summary judgment, takes the different tack of suggesting that that case is not controlling. Characterizing *David* v. *Belmont* and *Fottler* v. *Moseley, supra,* as antiquated and largely discredited, Peat Marwick contends that subsequent Massachusetts cases such as *Rice* v. *Price,* 340 Mass. at 510-511, and *VMark Software, Inc.* v. *EMC Corp.,* 37 Mass. App. Ct. 610, 619 (1994), have recognized "loss causation" (under which Peat Marwick contends the plaintiffs must show that the fraud itself proximately caused the price of the shares to decline) as a necessary element of a common-law fraud claim. It also calls our attention to Federal decisions in the securities fraud context that are said to have developed the loss causation concept by borrowing from common-law tort jurisprudence.

Loss causation, a concept that has developed in the Federal securities fraud context over many years, is an element that a plaintiff must prove in order to maintain a private action under SEC Rule 10b-5 and § 10(b) of the Securities Exchange Act of

spread misrepresentations of those who issue or market them. The fact that the market price is inflated or depressed by the misrepresentation is the important factor making the price fictitious; it is, therefore, immaterial that the inflated or depressed price does or does not result [solely] from the misrepresentations of the same person who made the misrepresentation on which the person seeking recovery relied."

[20]Peat Marwick expresses a concern that under a rule awarding damages based on the difference between the price paid and the "actual value" on the date of the initial sale, the plaintiffs would be entitled to damages even if the share price of the Marcam stock had increased after the original sale and they had suffered no loss, because they would be entitled to the difference between the price paid and the "actual value" on the date of the initial sale "no matter what caused the loss" when the shares were sold and even if they were later sold for more than the original price paid. This concern is unwarranted, because the rule only provides for recovery of damages where a plaintiff has suffered a loss. See Restatement (Second) of Torts § 549(1)(a) & comment b; *Cardullo* v. *Landau,* 329 Mass. 5, 7 (1952).

1934. Although loss causation has been a statutorily required element in such claims since 1995, it still does not have uniformity of definition or application among the Federal circuits.[21] The different Federal circuits that have formulated the concept have used quite different approaches and generally agree only that a plaintiff must prove a causal nexus between a plaintiff's posttransaction pecuniary injury and the defendant's fraudulent conduct at the time of the transaction; they remain in deep disagreement as to what the nature of that nexus is. The burden that plaintiffs must overcome in the different circuits to satisfy loss causation accordingly runs the gamut from, at one extreme, being required to identify specifically how the defendant's fraud at the time of the transaction caused the plaintiff's posttransaction losses to, at the other, being required to demonstrate only that the defendant's fraud was in some way responsible for artificially altering the transaction price and bringing about the plaintiff's posttransaction losses. The latter loss causation burden is patently easier for plaintiffs to satisfy than the former.

Without discussing the conceptual disarray in the term "loss causation" in Federal securities law at present, see note 21, *supra*, Peat Marwick urges that a quite stringent variant is either already an element of our common-law fraud doctrine or, if it is not, that it should be. In this regard, Peat Marwick says the Reismans cannot establish loss causation because, notwithstanding the Reismans' reliance upon Peat Marwick's fraudulent misrepresentations at the time of the transaction, they cannot prove such misrepresentation caused the price of Marcam stock to decline after the transaction, since those misrepresentations were plainly not made public until well after the Reismans sold their Marcam stock. In our opinion, however, the Reismans are not required under Massachusetts law (nor would they be under the Restatement [Second] of Torts) to establish this as an element of their fraud claim.

We are not persuaded, in the first instance, that *David* v. *Bel-*

---

[21] For a compilation of the Federal case law and analysis of the different circuits' approaches, see Escoffery, Note: A Winning Approach to Loss Causation, 68 Fordham L. Rev. 1781 (2000). For a critique of the concept of loss causation, see Kaufman, Loss Causation: Exposing a Fraud on Securities Law Jurisprudence, 24 Ind. L. Rev. 357 (1991).

*mont, supra,* or, for that matter, *Fottler* v. *Moseley, supra,* have been discredited or superseded by later Massachusetts cases.[22]

---

[22]The defendant refers to a footnote in *International Totalizing Sys.* v. *PepsiCo, Inc.,* 29 Mass. App. Ct. at 432 n.13, as suggesting that later cases have discredited *David* v. *Belmont* and *Fottler* v. *Moseley.* The footnote, and *Saunders* v. *Goodman,* 8 Mass. App. Ct. at 617, cited by it, raised a question as to what foreseeability is required to establish liability for losses resulting from reliance on fraudulent misrepresentation; rather than discrediting the *David* and *Fottler* cases, however, these later cases served to acknowledge their continuing viability.

*Saunders* v. *Goodman,* 8 Mass. App. Ct. at 617, noted that Prosser, Torts § 110, at 732 (4th ed. 1971), had described the *Fottler* and *David* cases as not requiring the same standard of foreseeability as required by courts in other States. Apparently this was in reference to the fact that *Fottler* v. *Moseley,* 185 Mass. at 565-566, held that the defendant broker, whose false representation had induced the plaintiff to refrain from selling stock in a certain company, was not relieved of liability by the subsequent embezzlement of money from the company by the company's president. The holding in *Fottler* v. *Moseley, supra* at 565, differs from the position of the Restatement (Second) of Torts § 548A comment b ("no liability when the value of stock goes down not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition"; for example, no liability when the shares go down because of the sudden death of the corporation's leading officers), and § 549 comment c (no recovery for "a loss in the value of the securities that is in no way due to the falsity of the representation but is caused by some subsequent event that has no connection with or relation to the matter represented"; comment c gives as an example a loss caused solely by speculations of a bank's cashier). Since such an issue does not arise in *David* v. *Belmont, supra,* or in the case at bar, it requires no further discussion. The misrepresentation here concerned the financial condition of the company (Marcam) whose stock was to be exchanged for that of the plaintiffs' company (Varnet); a subsequent decline in the price of the misrepresented company's (Marcam's) stock hence was a risk that could foreseeably be expected to follow from the character of the misrepresentation relied upon by the plaintiffs. See *David* v. *Belmont,* 291 Mass. at 453-454. See also *Rice* v. *Price,* 340 Mass. at 507. It is to be noted that § 549 comment c of the Restatement (Second) of Torts points out specifically that subsequent changes in financial or business conditions that, coupled with a false representation, contribute to an increase or decrease in the market price of securities, do not fall within the rule mentioned above; that is, subsequent changes in business conditions do not prevent the new market price from being used to measure damages. See *ibid; Whiting* v. *Price,* 172 Mass. at 242-243; *David* v. *Belmont,* 291 Mass. at 455; *Saunders* v. *Goodman,* 8 Mass. App. Ct. at 616.

See also § 548A comment b of the Restatement (Second) of Torts, which states that one who misrepresents the financial condition of a company in order to sell its stock is liable to a purchaser who relies on the misinformation for the loss he sustains when the facts become known and the value of the

Nor, contrary to the defendant's contention, did *Rice* v. *Price*, 340 Mass. 502, 510-511 (1960), and *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 619 (1994), hold "loss causation" or an equivalent concept to be a necessary element of a common-law fraud claim. We think Peat Marwick's reading of these cases is incorrectly dependent on the conflation of key terms.

Both *Rice* v. *Price* and *VMark Software, Inc.* v. *EMC Corp.* use terms such as "direct" and "proximate" in the context of discussing *what* damages a fraud victim may recover, not *whether* he may have recovery at all. To the extent that they discuss whether the loss suffered was legally caused by the fraud, the focus is upon whether the plaintiff acted to his detriment in reliance upon the fraudulent misconduct. See *Rice* v. *Price*, 340 Mass. at 507; *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. at 617-619. The extent of the detriment or loss sustained for which the plaintiff may recover in damages is then limited to whatever was a direct result of the wrong. In both cases the term "proximate" is used in describing the standard for determining what *consequential* damages are permissible. In *Rice* v. *Price*, 340 Mass. at 504, the plaintiffs were awarded damages to compensate them for the losses they suffered in setting up a distributorship for certain heaters based on representations that proved to be untrue. They were entitled to compensation not just for what they paid for the defective heaters, but also for other losses in setting up the business. In a discussion on reconciling the different rules for determining damages, Justice Cutter stated, 340 Mass. at 510, quoting from Prosser, Torts § 91, at 570 (2d ed. 1955), "In addition . . . [to damages under the benefit of the bargain rule] the plaintiff may recover for consequential damages, such as . . . expenses . . .

shares depreciates, because that is a foreseeable result of the misrepresentation. Section 548A comment b also states, "In determining what is foreseeable, the possibility of the intervening events is not to be excluded altogether." It gives this example: when the financial condition of a company is misrepresented and the company subsequently becomes insolvent because of the depressed condition of an entire industry, which has no connection with the facts misrepresented, the false representation may still be found to be the legal cause of the loss suffered by a purchaser who relied on it, because if the company had been in sound condition as represented it might have survived, and such a result is foreseeable.

provided they are regarded as 'proximate' results of the misrepresentation." Similarly, in *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. at 619, the court used the phrase "proximate result of [the] misleading representations" in reference to consequential damages to which the plaintiff in counterclaim was entitled in addition to reimbursement for the faulty equipment purchased as a result of misrepresentations. In both cases, the focus was on making the injured party whole — "to restore the status quo ante, as if the transaction had never occurred." *Ibid.*, quoting from *Zimmerman* v. *Kent*, 31 Mass. App. Ct. 72, 82 (1991). Neither case can fairly be read as importing wholesale the negligence concept of proximate causation into the intentional tort of fraud, let alone the Federal securities fraud concept of loss causation, which is itself not synonymous with proximate causation. We discern no support in our cases for the loss causation element that Peat Marwick espouses, nor do we think this troubled concept a desirable addition to our jurisprudence.

d. *Motion for summary judgment on false representation claim.* The Reismans have offered proof that, in deciding to swap their interests in Varnet for stock in Marcam, they relied upon false misrepresentations by Peat Marwick that overstated the financial condition of Marcam and thereby allowed the market price of its stock to become artificially inflated. Had they known the true financial condition of Marcam, the Reismans would not have exchanged their $23 million interest in Varnet for what the Reismans' experts say was only $5,088,750 worth of Marcam stock. Such misrepresentations induced the Reismans to act to their detriment and thereby did them a wrong. Compare *David* v. *Belmont*, 291 Mass. at 450-451, 454. Our case law does not impose upon the plaintiff the burden of ruling out alternative causes other than the fraud for the stock's decline in market price. See *David* v. *Belmont*, 291 Mass. at 455; Restatement (Second) of Torts § 549 comment c. Moreover, the fact that the price was artificially inflated implies an eventual decline in price whether or not other causes intervene. Such other factors may affect the measure of damages; they do not go to causation or to prevent any recovery at all. Further, the Reismans presented an expert witness's opinion that analysts began

to question the integrity of Marcam's earnings sometime after the Varnet-Marcam sale and before the disclosure of the misrepresentations; this indicates that the decline in price during that period may have been related to the initial misstatements. Once liability is established, the Reismans would be entitled to recover damages that "flow naturally," i.e., directly, from the wrong, to wit, the misrepresentations that induced their acquisition and subsequent forced retention of Marcam stock. Such damages here would encompass the difference between the price at acquisition and the price at disposition. See *David* v. *Belmont*, 291 Mass. at 454-455; Restatement (Second) of Torts § 549(1)(a) & comments b, c. The fact that the Reismans sold their shares prior to the disclosure of the misrepresentations does not deprive them of a remedy; rather, the proceeds of the sale would serve to mitigate damages. In sum, the plaintiffs have presented sufficient facts to withstand the motion for summary judgment on the fraudulent misrepresentation claim.

2. *Negligent misrepresentation.* In 1998, the Supreme Judicial Court, adopting the test taken from § 552 of the Restatement (Second) of Torts (1977),[23] established the contours of an auditor's liability for negligent misrepresentations to persons with whom it is not in privity. *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 493-498. On the basis of the *Nycal* case, the motion judge granted summary judgment for Peat Marwick on the Reismans' negligent misrepresentation claim.

---

[23]Section 552 states in part:

"(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

"(2) [That] liability . . . is limited to loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction."

The Reismans maintain that, because of the materially different facts in this case, the *Nycal* case does not dispose of their claim.

Briefly, *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 496-499, holds that liability to third parties attaches only when, at the time an audit report containing negligent misrepresentations is published, the auditor has actual knowledge both of the limited group of potential third parties who will rely on the report and of the particular transaction that such information is designed to influence. In the *Nycal* case the plaintiff's investment in a public company became worthless when, two years later, the company filed for bankruptcy. The plaintiff sued Peat Marwick, the company's auditor, claiming that its audit report, which was included in the company's annual report and relied upon by the plaintiff, misrepresented the company's financial condition. *Id.* at 492. Summary judgment for the auditor was upheld because, at the time Peat Marwick issued its audit report, it did not know or intend that the plaintiff, or a limited group of which the plaintiff was a member, would rely on the audit in relation to an investment in its client; it did not know that the report would be used by its client to locate a purchaser, especially given the client's known resistance to takeover attempts and the dissimilarity of this transaction to prior transactions; it did not intend to influence the transaction in question, about which it learned only days before the sale was completed; and

> "[t]he record does not exhibit that the defendant knew of any particular use that would be made of its audit report. Cf. *Guenther* v. *Cooper Life Sciences, Inc.*, 759 F. Supp. 1437, 1443 (N.D. Cal. 1990) (accountants knew that audit report would be placed in prospectus for public offering and had expressly consented to its inclusion). 'Under the Restatement rule, an auditor retained to conduct an annual audit and to furnish an opinion for no particular purpose generally undertakes no duty to third parties.' *Bily* v. *Arthur Young & Co.*, [3 Cal. 4th 370,] 393 [1992]."

*Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 499-500.

The *Nycal* case, then, presents formidable barriers to recovery

for third parties seeking to hold auditors liable for negligent misstatements in their audit opinions in annual reports. See *Spencer* v. *Doyle,* 50 Mass. App. Ct. 6, 13 (2000). The Reismans contend that they circumvent these barriers in two ways. First, though conceding that Peat Marwick had no idea at the time it issued the audit opinions in 1991 and 1992 that they would be relied upon by the Reismans in 1993 in relation to Project Snowbird, the Reismans argue that they were part of a limited class of people — investors in companies being acquired by Marcam — whom Peat Marwick could expect would rely upon its opinions. See *Nycal Corp.* v. *KPMG Peat Marwick LLP,* 426 Mass. at 499; Restatement (Second) of Torts § 552 comment h.[24] Second, they allege that Peat Marwick's subsequent affirmance of these false statements in documents filed with the SEC "carried forward" the misrepresentations so as to establish liability.

There are manifest differences, to be sure, between the situation here and in the *Nycal* case. In *Nycal* — unlike here — there was no indication that Peat Marwick wore any but an auditor's hat; unlike here, there was no evidence in *Nycal* that Peat Marwick had actively participated in the transaction at issue. Nor was there any evidence that its client had a history of transactions akin to the one at issue, that the auditor had a history of actively participating in such transactions, or that it was aware that its audit opinions were relied upon in the transaction at issue. Because auditors, acting as such, issue audit opinions and the subsequent distribution of such opinions to third parties is generally out of their hands, see *Nycal,* 426 Mass. at 494; the

---

[24]Comment h states (in part):

> "It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it . . . . It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given."

court in *Nycal* recognized the legitimate need to circumscribe the liability of auditors to third parties. It is not entirely evident, however, that *Nycal* similarly circumscribes liability for the audit opinions of accounting firms that act beyond the audit function and participate actively in transactions where their prior audit opinions are circulated with their knowledge, let alone where those audit opinions are knowingly circulated to a company audited by an affiliate of the accounting firm. We need not decide the impact of *Nycal* in this regard, however, because we are persuaded that the Form S-8 filing with the SEC in May, 1993, suffices to establish a claim for liability in the present case.

The Reismans suggest that both the Form 10-Q and Form S-8 filings, which they maintain were prepared in 1993 in the midst of the transaction at issue and circulated to them with Peat Marwick's knowledge and upon which they relied in making the deal, trigger Peat Marwick's liability for negligent misrepresentation. Both forms, they claim, carried forward the misrepresentations in the earlier audit opinions by incorporating the misrepresentations concerning the European subsidiaries and the nature of the MAPICS transaction, and, as to Form S-8, falsely asserting that those audit opinions remained free from misrepresentation.

Although Peat Marwick instructed Marcam on how to report financial transactions and reviewed, edited, and helped prepare the information that Marcam reported to the SEC in Form 10-Q, that document contains no signature, opinion, representation or statement whatsoever by Peat Marwick. That such conduct may not be in accord with professional norms is not dispositive.[25] We think the Form 10-Q insufficient to establish Peat Marwick's liability for negligent misrepresentation. See *In re Kendall Square Research Corp. Sec. Litigation*, 868 F. Supp. 26, 28 (D. Mass. 1994). But see *Dannenberg* v. *Painewebber Inc. (In re Software Toolworks Inc. Sec. Litigation)*, 50 F.3d 615, 628-

---

[25]See *Professional Standards for Certified Public Accountants*, AU § 711.13 (American Inst. of Certified Pub. Accountants 1996) ("If an accountant concludes on the basis of facts known to him that unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement are not in conformity with generally accepted accounting principles he should insist on appropriate revision").

629 & n.3 (9th Cir.), cert. denied sub nom. *Montgomery Sec.* v. *Dannenberg*, 516 U.S. 907 (1995); *Howard* v. *Everex Sys.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000).

In contrast, however, prior to the issuance of the Form S-8, Peat Marwick signed a statement consenting to the incorporation in the Form S-8 Statement of its earlier audited financial statements.[26] The Reismans' expert stated in a deposition that Peat Marwick thereby represented that those audited reports remained accurate and free from false and misleading statements to the date of the Form S-8.[27]

We conclude that Peat Marwick's reaffirmed misrepresentations in connection with Form S-8, issued and circulated as it was in the midst of the Varnet-Marcam deal in which Peat Marwick played an active and variegated role, suffice to establish a claim for liability. Although Peat Marwick argues that there is no evidence it knew the Reismans would rely on its audit opinions and on Form S-8, an inference of such awareness could be drawn from the facts of record. Moreover, there is specific evidence that Peat Marwick knew these documents were given to the Reismans: all closing documents were sent to Peat Marwick for its review, including the Securities Purchase Agreement, which specifically stated that Marcam had furnished the Reismans with copies of all SEC documents including the

---

[26]The form, entitled "Consent of Independent Certified Public Accountants," was directed to Marcam's board. It stated:

"We consent to the incorporation by reference in this Registration Statement on Form S-8 of Marcam Corporation of our reports dated October 26, 1992, relating to the consolidated financial statements and financial statement schedules of Marcam Corporation and subsidiaries as of September 30, 1992 and 1991, and for the years ended September 30, 1992, 1991 and 1990, which reports appear in the September 30, 1992 annual report on Form 10-K of Marcam Corporation."

[27]A witness deposed by the plaintiffs described the "down-to-date" process undertaken by auditors in advance of an S-8 filing:

"A down-to-date process is an activity for the auditor to determine whether any events or transactions subsequent to the date of their audit report and up to the consent date of the registration statement would have had an impact on the financial statements or should be disclosed in the financial statements in order to make them not misleading."

Form S-8, and Peat Marwick indicated in its certification that it had read all the closing documents. Contrast *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 499, in which the auditor learned of the disputed transaction, not involving acquisition of the purchaser's company, only a few days before the closing, and the auditor did not participate in the transaction.

3. *Chapter 93A claim.* The Reismans contend that the judge erred in granting summary judgment against them on their claim pursuant to G. L. c. 93A, insofar as he ruled that they may not maintain a claim under § 11 because they did not have a significant business relationship with Peat Marwick.

The Reismans allege an unfair practice by an accounting firm within the context of the sale of a business to the accounting firm's client, in which transaction the accounting firm played an active role. As we stated in *Standard Register Co.* v. *Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995):

> "[P]rivity is not required to maintain a nonwarranty-based action under 93A, i.e., one based on fraud, so long as the parties are engaged in more than a minor or insignificant business relationship. See *Mongeau* v. *Boutelle*, 10 Mass. App. Ct. 246, 247-248 (1980). Contrast *Nei* v. *Boston Survey Consultants, Inc.*, 388 Mass. 320, 323-324 (1983). See also *Chestnut Hill Dev. Corp.* v. *Otis Elevator Co.*, 653 F. Supp. 927, 933 (D. Mass. 1987) (discussion of privity requirement)."

Here, the summary judgment record contains sufficient facts to demonstrate that the relationship between Peat Marwick and the Reismans was more than trivial and to meet the *Standard Register* standard: Peat Marwick was in direct contact with Howard Reisman during the transaction; it assigned a partner to advise him, who was ultimately added to the project group and sat on the Reismans' side of the negotiating table, including at an "all-hands" meeting. Peat Marwick was responsible for the structure of the transaction and reviewed all documents related to it. Peat Marwick reaffirmed that documents it knew or had reason to know the Reismans would receive were free from material misrepresentation. Contrast *Spencer* v. *Doyle*, 50 Mass.

App. Ct. at 13. And Peat Marwick — albeit the conglomerate's Canadian confederate — served as the auditor of record for Varnet, the Reismans' company, a fact of which Peat Marwick Boston was aware. We think the nature of the relationship between the Reismans and Peat Marwick far different from the arm's-length scenario in *Nei* v. *Boston Survey Consultants, Inc.*, 388 Mass. at 321, 324. Accordingly, summary judgment should not have been granted for the defendant on the G. L. c. 93A, § 11, claim.

*Judgment reversed.*