van Gestel, J.
This matter is before the Court on cross motions for summary judgment. The plaintiffs, Imprimis Investors, LLC and Wexford Spectrum Investors, LLC (jointly “Wexford”), have moved for partial summary judgment dismissing the third affirmative defense of release asserted by KPMG Peat Marwick, LLP (“KPMG”), finding that KPMG violated certain Generally Accepted Auditing Standards and finding that KPMG violated certain industry standards in performing its subsequent review of First New England Dental Centers, Inc. (“FNEDC”). See Paper #153. The defendant KPMG has moved for summary judgment on all counts of the complaint. See Paper #157.

BACKGROUND

For purposes of these two motions the following undisputed facts will suffice.
In late July 1997, Wexford lent approximately $14,500,000 to FNEDC. Wexford claims that its lending was in reliance upon an audit report (“Audit Report”) issued by KPMG and certain accompanying audited financial statements of FNEDC for the period ending December 31, 1996 (the “1996 financials”). Wexford charges KPMG with negligence, recklessness and intentional actions in issuing the Audit Report.
Wexford was first introduced to FNEDC in June 1997. There followed a series of communications between Wexford and FNEDC, to which KPMG was not a party. In reliance upon certain representations made by FNEDC executives, and information contained in a copy of the 1996 financial statements of FNEDC, Wexford agreed, on July 23, 1997, to invest $14.5 million in pre-IPO senior secured notes, subject to certain conditions set forth in the Note Purchase Agreement between Wexford and FNEDC.
The purpose for the loan to FNEDC was to act as a bridge to an initial public offering by FNEDC, to be completed sometime after Labor Day 1997. The Note Purchase Agreement between Wexford and FNEDC contained a requirement that KPMG issue an audit report on the 1996 financials without a “going concern” modification. A clean or unqualified audit report does not contain a going concern modification or qualification, and connotes an auditor’s belief that a company can continue as a “going concern” for a *52 12-month period from the date of the financials or, in this case, until December 31, 1997.
KPMG was not a party to the Note Purchase Agreement, but it is reasonable to infer that KPMG was aware of that agreement and its requirements regarding the audit.
There are a number of specific allegations of alleged failures by KPMG in performing and issuing its Audit Report.
FNEDC filed a registration statement with the SEC on October 23, 1997. It was advised by its investment bankers that the IPO could go forward only if FNEDC showed signs of becoming profitable. In fact, FNEDC never became profitable, and the IPO was never approved. On February 13, 1998, FNEDC filed for bankruptcy under Chapter 11 of the Bankruptcy Code.
There is affidavit evidence that before the closing of the loan from Wexford to FNEDC, KPMG indicated that it would not remove a “going concern” qualification and issue a clean Audit Report until it had substantial evidence that FNEDC had received funding from some investor or lender. Wexford then is said to have agreed to wait until the closing to obtain the Audit Report and the 1996 financials. In essence, at the closing there was to be a simultaneous exchange of the loan proceeds to FNEDC with a delivery of the executed Audit Report from KPMG.
The closing began on July 25, 1997. It was not a formal procedure. Rather, it was a wire closing in which FNEDC and its attorneys and Wexford and its attorneys exchanged various documents by facsimile transfer. As a result, on July 25, 1997, the closing documents were transmitted between counsel, as was most, but not all, of the funding. No one present at the closing recalls any question being raised about the issuance of the 1996 financials or the Audit Report from KPMG.
Because of a slight problem with transferring Wexford’s funds for the loan, however, the actual transfer of all of the funds was not completed until the following Monday, July 28, 1997.
KPMG finally cleared and executed its Audit Report on July 25, 1997. No one, however, either at the closing or at KPMG is able to testify when the Audit Report and the 1996 financials were actually delivered to Wexford. In short, there is no record evidence that Wexford received the Audit Report before funding the loan.
Paragraph 4 of Note 11 of the Audit Report reads as follows:
On July 25, 1997, [FNEDC] raised net proceeds of approximately $14,000,000 through a private debt offering. The proceeds from the offering will be used for working capital, acquisition of dental facilities and repayment of the bank line of credit. [FNEDC’s] management believes the proceeds will be sufficient to address their current liquidity requirements.
In connection with FNEDC’s bankruptcy there was a settlement of certain claims, and a release was executed on July 7, 1998. The release language reads as follows.
Imprimis, for itself and its officers, directors, employees, successors and assigns, including the Imprimis Representatives, does hereby forever remise, release and forever discharge the Trustee and NE Dental, their creditors and their estate (and, upon any substantive consolidation, O&W, its creditors and its estate), and their respective agents, attorneys, successors and assigns (the “Estate Releasees”) of and from any and all claims, debts, demands, actions, causes of action, suits, dues, and sums of money, accounts, reckonings, bonds, specialties, indemnities, executions, covenants, controversies, agreements, promises, doings, omissions, variances, damages, executions and liabilities, whether known or unknown, suspected or unsuspected, absolute or contingent, and whether previously asserted or otherwise, which Impri-mis Representatives may now have or may hereafter have against the Estate Releasees.
KPMG was a general unsecured creditor of FNEDC in its bankruptcy. It was not, however, a signatory to the release.
This, in a general way, is the factual backdrop for the cross motions.

DISCUSSION

“Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmov-ing parly, all material facts have been established and the moving party is entitled to judgment as a matter of law.” M.P.M. Builders, LLC v. Dwyer, 442 Mass. 87, 89 (2004); Kesler v. Pritchard, 362 Mass. 132, 134 (1972). Mass.R.Civ.P. Rule 56(c).
Wexford’s Motion
Wexford moves for partial summary judgment against KPMG seeking to strike KPMG’s defense that it is a beneficiary of the release in the FNEDC bankruptcy, and seeks to have liability adjudicated for alleged accounting errors in the Audit Report. The latter issuesrelating to the accounting errorsare replete with material factual disputes and competing expert opinions that cannot be resolved on a disposi-tive motion.
The release issue presents a much closer question. However, here too there are material facts to be resolved about the reach of the release and the intent behind it.
Wexford’s motion must be DENIED.
*53 KPMG’s Motion
KPMG’s motion is predicated in major part upon the contention that there is an absence of evidence to support Wexford’s claim that it detrimentally relied upon the Audit Report, in significant part because Wexford cannot establish that it had received the Audit Report before it closed on the loan to FNEDC.
There is no privity between Wexford and KPMG. KPMG was not a party to the Note Purchase Agreement between Wexford and FNEDC, did not participate in the loan closing and never communicated directly with Wexford. That, however, is not sufficient to relieve KPMG of possible liability.
“In order to recover for negligent misrepresentation!,] a plaintiff must prove that the defendant (1) in the course of his business, (2) supplied] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information.” Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct 15, 19-20 (1998). Golber v. BayBank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999).
Savers Property & Casualty Insurance Company v. Admiral Insurance Agency, Inc., 61 Mass.App.Ct. 158, 169 (2004).
The principal element argued by KPMG is that because its Audit Report was not in the hands of Wexford before the closing, there can be no justifiable reliance by Wexford upon the information contained therein.
Sec. 552 of the Restatement (Second) of Torts describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
That liability is limited to
loss suffered (a) by a person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The SJC in Nycal v. KPMG Peat Marwick, LLP, 426 Mass. 491 (1998), addressed, for the first time, “the scope of liability of an accountant to persons with whom the accountant is not in privity.” 426 Mass, at 493. In doing so, it adopted the test taken from Sec. 552 of the Restatement. Id., at 497-98.
Also, in Nycal, the SJC concurred with the California Supreme Court’s holding in Bily v. Arthur Young & Co., 3 Cal.4th 370, 394, 834 P.2d 745, 769 (1992), that Sec. 552 appropriately recognizes the commercial realities in play. Nycal, supra, 426 Mass, at 497. In Bily, the California court spoke of both negligent misrepresentations and intentional fraud in the preparation and dissemination of an audit report. Bily, supra, 834 P.2d at 747.
Nycal particularly adopted Comment h to Sec. 552 of the Restatement, which reads as follows.
[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it ... It is sufficient, in other words, insofar as the plaintiffs identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
Nycal, supra, 426 Mass, at 497.
If Wexford’s claim is deemed an action for deceit, it must prove that KPMG made a false representation of material fact with knowledge of its falsity for the purpose of inducing Wexford to act thereon, and that Wexford relied upon the representation as true and acted upon it to its damage. Reisman v. KPMG Peat Marwick, LLP, 57 Mass.App.Ct. 100, 108-09 (2003).
In Reisman, at p. 110, Justice Lenk said “that an accounting firm that, in its role as auditor, falsely certifies a company’s annual report as being free from material misstatement has reason to expect at the time it so certifies that its statement will be relied upon by potential investors.”
Reading Nycal and Reisman together, for purposes of KPMG’s motion at least, leads the Court to the preliminary conclusion that Wexford, as a lender to, or investor in, FNEDC, which was probably known to *54 KPMG to be such, fits within the category of persons or entities to whom KPMG owed some degree of reasonable care in connection with the Audit Report as ultimately issued. See, e.g., Restatement (Second) of Torts, sec. 531, illus. 4.
There remains a factual question about whether KPMG, in preparing the Audit Report, was intending thereby to influence entry by Wexford into the Note Purchase Agreement with FNEDC or rather was doing so solely in connection with FNEDC’s annual audit and to furnish an opinion for no particular purpose and, therefore, undertook no duty to a third party like Wexford. See Nycal, supra, 426 Mass, at 500.
Thus, the determinative issue presented by KPMG’s motion is that which relates to the reliance by Wexford on the Audit Report and whether it acted on the information contained therein. “Reliance is an element of actionable fraud.” Nei v. Burley, 388 Mass. 307, 311 (1983); Bishay v. Foreign Motors, Inc.; Mercedes-Benz of North America, 416 Mass. 1, 12 (1993). Reliance is also an element of a negligent misrepresentation claim, and Wexford must be able to establish both actual and justifiable reliance. See D. Goldwasser, Accountants’ Liability, pp. 4-47 and 5-48. Actual reliance requires
individual reliance by the plaintiff directly on the report or opinion of the accountant. No judicial presumption of reliance is available . . . Since actual reliance is required in a negligent misrepresentation case, there can be no transaction causation where the plaintiff did not actually read or did not rely on the report or statement of the defendant accountant.
Id. at p. 4-26.
“The principle is well settled, that if a person makes a representation of fact, as to his own knowledge, in relation to a subject matter susceptible of knowledge, and such representation is not true; if the party to whom it is made relies and acts upon it, as true, and sustains damage by it, it is a fraud and deceit, for which the party making it is responsible.” (Emphasis added). Powell v. Rasmussen, 355 Mass. 117, 119 (1969).[3]
The burden of proof at trial is on Wexford as to all elements of its negligent misrepresentation and fraud claims, including particularly, for these purposes, the element of reliance. Further, although KPMG as the moving party has the burden of showing that there are no material facts in dispute, it can satisfy that burden by demonstrating that Wexford has no reasonable expectation of proving the essential element of reliance at trial. Flesner v. Communication Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. GeneralMotors Corp., 410 Mass. 706, 716 (1991). “Bare assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment.” Polaroid Corp. v. Rollins Environmental Services, Inc., 416 Mass. 684, 696 (1993). Wexford cannot rest on its pleadings and mere unsupported assertions of disputed facts to defeat KMPG’s motion. Lalonde v. Eissner, 405 Mass. 207, 209 (1989).
While reliance need not occur at a discrete point in time, the event or thing upon which it is based must, of necessity, happen before the event it is claimed to have produced. “The element of reliance cannot be present where the accountant’s report or statement is prepared or submitted after the transaction in question.” Id. at p. 4-47. See Zucker v. Sasaki, 963 F.Sup. 301, 306 (S.D.N.Y. 1997) (because the transaction took place prior to issuance of the auditor’s report, there could be no reliance thereon). There is nothing in the record before this Court that shows, or permits any reasonable inference, that KPMG knew that its Audit Report had been received by Wexford before the closing of the loan. See Reisman, supra, 57 Mass.App.Ct. at 111, 125-25a.
Further, and of determinative significance, Wexford “agreed, on or about July 23, 1997, to invest $14.5 million in pre-IPO senior secured notes, subject to the conditions to be set forth in a Note Purchase Agreement.” Complaint, Para. 30. Wexford is bound by this factual assertion. G.L.c. 231, Sec. 87; Wood v. Roy Lapidas, Inc., 10 Mass.App.Ct. 761, 765 (1980). At the earliest, the Audit Report was not executed by KPMG until July 25, 1997, as demonstrated by Note 11 therein; and there is no affidavit or other evidence in the record suggesting in any way that Wexford had seen or examined the Audit report on or before its decision to invest on July 23, 1997.
Having agreed to lend or invest in FNEDC on July 23, 1997, Wexford cannot now argue that it relied on KPMG’s Audit Report that, at the veiy earliest, was not signed off and delivered until July 25, 1997.[4]
Wexford argues that reliance need not depend upon physical receipt of a particular document. Rather, it says, reliance can occur when a party acts so as to change its position to its disadvantage upon a representation of another. Wexford, however, had no communication or contact with KPMG before, or even at, the July 25, 1997, closing, or its completion on July 28, 1997. Further, Wexford presents no evidence that it received KPMG’s completed Audit Report before that closing. Wexford cannot, therefore, succeed on an argument that it acted upon any representation from KPMG.
Consequently, on the present motion record no claim grounded on reliance upon the KPMG Audit Report may proceed because there is no evidence presented that the report, in any form, was in Wexford’s possession before Wexford decided to lend or invest and then proceeded with the closing of the transaction with FNEDC. That being the case, as a matter of law, the necessary reliance on the Audit Report is absent. The negligent misrepresentation and fraud claims cannot survive.
*55 With regard to the 1996 financials, copies of which were received by Wexford before the closing, they do not provide a basis to impose liability on KPMG.
Financial statements are generated by a corporation’s management. The auditor’s duty is to express an opinion whether the financial statements conform to generally accepted accounting principles based upon audits conducted in conformance with generally accepted accounting standards. See Shore, Watching the Watchdog: An Argument for Auditor Liability to Third Parties, 53 SMU L. Rev. 387, 389 (2000).
Reisman, supra, 57 Mass.App.Ct. at 103, n.3.
The 1996 financials are representations of FNEDC and its management, not KPMG. The negligent misrepresentation and fraud claims cannot survive.
Wexford had no contact with KPMG, nor did it have any contractual or commercial relationship with KPMG. This alone is enough to defeat a claim under G.L.c. 93A, secs. 2 and 11. Szalla v. Locke, 421 Mass. 448, 451-52 (1995); Spencer v. Doyle, 50 Mass.App.Ct. 6, 12 (2000).
Further, although parties need not be in privity for their actions to come within the reach of G.L.c. 93A, Kattar v. Demoulas, 433 Mass. 1, 14-15 (2000), to bring such a claim there must be activity that constituted unfair or deceptive practices. “[A] practice or act will be unfair under G.L.c. 93A, Sec. 2, if it is (1) within the penumbra of a common-law, statutoxy, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys ‘R’ Us, Inc., Massachusetts, 441 Mass. 451, 457 (2004). See also Linkage Corporation v. Trustees of Boston University, 425 Mass. 1, 27 (1997); Heller Fin. v. Insurance Co. of N.Am., 410 Mass. 400, 408 (1991). There is, however, no binding definition of what constitutes an unfair practice under c. 93A. The existence of unfair acts and practices must be determined from the circumstances of each case. Green v. Blue Cross & Blue Shield of Massachusetts, Inc., 47 Mass.App.Ct. 443, 447 (1999).
Without more, sloppy auditing of financial statements and the resulting production of an inaccurate audit report that finds its way into the hands of a lender to, or investor in, the accountant’s client, after the closing on the loan or investment, is neither unfair nor deceptive, nor is it immoral, unethical, oppressive, or unscrupulous, particularly with regard to the non-client lender or investor.
The Rule 56 motion record does not support a claim based on G.L.c. 93A, secs. 2 and 11 by Wexford against KPMG here.

ORDER

For the foregoing reasons, the motion of the plaintiffs Imprimis Investors, LLC and Wexford Spectrum Investors, LLC for partial summary judgment, Paper #153, is DENIED, and the motion of the defendant KPMG for summary judgment on all counts of the complaint, Paper #157, is ALLOWED. Judgment of dismissal as to KPMG shall enter accordingly.

Given its resolution of the reliance issue, the Court need not delve into the issues of: whether the Audit Report contained a representation of fact which was not tme; whether the representation was made by KPMG to Wexford; or whether Wexford’s damages came about as a result of the representation rather thanas it appears herethe failure of FNEDC to become profitable, despite the loan by Wexford, and the IPO was for that reason never approved, all leading to the February 13, 1998, bankruptcy filing.

The Court observes that although there is no factual evidence that the Audit Report was delivered before July 25, 1997, there is much to suggest that it did not arrive until at least July 31, 1997.