NANCY BRUNO, trustee,[1] *vs.* BOARD OF APPEALS OF
WRENTHAM.

No. 02-P-1582.

Norfolk. December 12, 2003. - November 29, 2004.

Present: PERRETTA, KANTROWITZ, & BERRY, JJ.

*Practice, Civil,* Failure to raise issue. *Zoning,* By-law, Special permit, Site
plan approval, Nonconforming use or structure. *Statute,* Construction.

This court declined to consider an argument raised for the first time on appeal.
[531-532]
A property owner that had operated a truck maintenance facility on its property
for over ten years in accordance with the terms of a building permit, but
without ever having obtained a special permit as required by the local zon-
ing by-law, failed to demonstrate that its historic use of its property
constituted a protected prior nonconforming use under G. L. c. 40A, § 6,
either on the ground that an earlier site plan approval constituted the
functional equivalent of a grant of a special permit [532-535], or on the
ground that the use acquired lawful nonconforming status once the limita-
tions period set out in G. L. c. 40A, § 7, had expired [535-537].

CIVIL ACTION commenced in the Superior Court Department on
January 10, 2000.

The case was heard by *Elizabeth B. Donovan,* J.

*Brian M. Hurley* for the plaintiff.

*George A. Hall, Jr.,* for the defendant.

PERRETTA, J. For over ten years, the Delphic Trust and its
commercial tenants, collectively referred to as Delphic, oper-
ated a truck maintenance facility without ever having obtained a
special permit as required by the zoning by-law. They did so
under the apparent authority of an original building permit. This
controversy arose when, in September of 1999, the building
inspector denied a prospective tenant's application for a
certificate of occupancy because of a failure to comply with the

---

[1]Of the Delphic Trust.

special permit requirements of the by-law. Wrentham's zoning board of appeals (board) upheld the building inspector's denial, and a Superior Court judge affirmed the board's decision. Delphic's argument on appeal is that its historic use of its property constitutes a protected prior nonconforming use under G. L. c. 40A, § 6. Concluding that Delphic's use of its property was never lawful and, therefore, not protected by § 6, we affirm the judgment.

1. *The facts.* In 1984, Delphic acquired a parcel of unimproved land located on Industrial Road in Wrentham. It did so with the intention of developing the site as a commercial truck maintenance and repair facility. The parcel is located within a "C-I" (commercial industrial) district. In order to operate a truck maintenance facility within a C-I zone, Delphic was required by art. 4.3 of the zoning by-law, as in effect in 1984, to obtain site plan approval as well as a special permit from the planning board.[2]

In 1984, Delphic applied for and obtained site plan approval for a "truc[k] maintenance and refueling depot," subject to certain conditions imposed by the planning board. Erroneously believing it had met all the requirements of art. 4, Delphic neither applied for nor received a special permit.[3] Despite the lack of a special permit, the building inspector issued a building

---

[2]Article 4.3 of the 1978 by-law, entitled "Uses Permitted in Commercial Industrial District," as in effect in 1984, provides in relevant part:

"Zoning District C-I is intended to be used for larger commercial and industrial purposes. The following uses are permitted within the district subject to conditions and limitations of an approved site plan and special permit issued by the Planning Board: a. Any use listed in section 4.2."

In addition to establishing five categories of uses allowed in a retail business district subject to site plan approval, art. 4.2 provides for certain uses permitted subject to "conditions and limitations contained in an approved site plan and special permit" including, as determined by the judge, a motor vehicle sales, service, and repair facility. (As contained in the record appendix, that portion of art. 4.2 pertaining to motor vehicle sales, service, and repair is illegible.)

[3]In petitioning the planning board, Delphic used a standardized application form upon which it checked the box indicating that it was seeking site plan approval. Although the form also included boxes to indicate a request for a special permit, variance, or appeal, Delphic did not check the box to denote it was also seeking a special permit.

permit to Delphic in March, 1985. A certificate of occupancy was issued five months later.

Thereafter, and into 1990, Delphic operated a truck maintenance and storage facility on the premises. It also sold and leased trucks from the facility. Sometime in 1990, Delphic ceased its operations but leased its facility to a commercial tenant who used it for substantially the same purposes until December 31, 1995. Delphic then leased the premises to a second trucking company on a short-term basis, that is, from January through March, 1996.

In the meantime, in 1992, Wrentham amended its by-law and established an aquifer protection overlay district that included the area in which Delphic's property is located. Under art. 15 of the by-law, as amended, a special permit is required to operate a truck maintenance facility within the aquifer protection district.

After the expiration of the short-term lease and through 1999, the premises remained vacant while Delphic searched for a new lessee. To assist in its search, Delphic hired a real estate agent specializing in the needs of trucking companies. Seeking to forestall any eleventh hour impediment to consummating a lease, Delphic required potential lessees to seek a certificate of occupancy concurrent with any lease negotiations.

Between 1996 and 1997, a number of potential lessees made informal inquiries of the building inspector relative to obtaining a certificate of occupancy. The building inspector advised each prospective tenant that site plan approval and a special permit would be required before an occupancy certificate could be issued.

In September, 1999, a prospective tenant by the name of Alternate Energy, Inc. (Alternate), applied to the building inspector for a certificate of occupancy, seeking approval to use Delphic's property for "storage and repair of trucks, roll-off containers, trailers and uses accessory thereto." The building inspector denied Alternate's application on the basis of its failure to comply with the special permit requirements of the by-law.[4] Delphic took an appeal from the building inspector's ruling to

---

[4]The building inspector determined that Alternate's proposed use of the property would require a special permit under art. 4, and a special permit

the board. Finding that a special permit was required but not obtained, the board affirmed the building inspector's denial of the application. The board concluded that the use of the premises that had commenced pursuant to the site plan approval obtained by Delphic in 1984 had been discontinued in the Fall of 1996. Article 3.4.b.3 of the by-law provides that a nonconforming use that is discontinued for a period of two years is deemed abandoned and may not be reestablished. That being so, the board ruled that any arguable nonconforming use had been abandoned in 1998 and that any use subsequent to that time had to comply with the by-law as then in effect.[5] In its decision, the board also cited the prohibition concerning the storage of petroleum products as set out in art. 15 of the by-laws, as amended in 1992.

Delphic, seeking to annul the board's decision and obtain a declaration that neither it nor any prospective tenant was required to secure a special permit to use the property in question in a manner consistent with its prior use, next took the matter to the Superior Court pursuant to G. L. c. 40A, § 17, and G. L. c. 231A. The judge found that Delphic had used the premises in violation of art. 4.3 and, therefore, the facility was not a lawful preexisting use entitled to protection under G. L. c. 40A, § 6. Because of this conclusion, the judge did not reach the question whether the interruption in use from 1996 until the time of trial constituted a discontinuance or abandonment sufficient to extinguish any claimed lawful nonconforming status.[6]

2. *Discussion.* Our analysis of Delphic's claims begins with

under art. 15, but that the "land and the structure" were "grandfathered," i.e., protected from the application of art. 15.

[5]In denying Alternate's application for an occupancy permit, the building inspector did not cite to art. 3.4.b.3. The theory of abandonment was apparently advanced by abutters who appeared before the board in opposition to Delphic's appeal.

[6]The planning board's 1984 approval of Delphic's site plan included approval of the installation of two underground fuel storage tanks. However, Delphic never installed the tanks nor did it ever use its premises for the underground storage of fuel. The judge expressly ruled that the use of the premises for the underground storage of fuel had been abandoned. Delphic does not appeal from this aspect of the judge's ruling. Rather, Delphic's appeal concerns only those rulings concerning its historic use of the premises for truck maintenance. Any objections that might have been taken to the judge's ruling concerning underground fuel storage are, therefore, deemed

that part of G. L. c. 40A, § 6, that exempts *lawfully* existing uses from the application of subsequently enacted zoning regulations.[7] See *Derby Ref. Co.* v. *Chelsea*, 407 Mass. 703, 708 (1990); *Mendes* v. *Board of Appeals of Barnstable*, 28 Mass. App. Ct. 527, 529 (1990). It is against the backdrop of § 6 that Delphic advances three arguments in support of its position that its use of its property has been lawful: (1) the special permit requirement of art. 4.3 is invalid; (2) the planning board's 1984 approval of Delphic's site plan must be deemed the functional equivalent of a grant of a special permit; and (3) a use begun in violation of a zoning by-law but in accordance with the terms of an original building permit acquires lawful nonconforming status pursuant to c. 40A, § 6, once the limitation period set out in c. 40A, § 7, has expired.[8] We consider these claims as narrowly framed and presented to us by Delphic.[9]

a. *Validity of art. 4.3 of the by-law.* Delphic argues that the special permit requirement of art. 4.3, as in effect in 1984, see note 2, *supra*, was invalid in that it made every use within a C-I district subject to the grant of a special permit.[10] See *SCIT, Inc.* v. *Planning Bd. of Braintree*, 19 Mass. App. Ct. 101, 106-111, (1984).

Notwithstanding any potential merit to Delphic's argument, we cannot ignore the fact that Delphic not only failed to raise

---

waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). See also *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.*, 396 Mass. 818, 821 n.4 (1986).

[7]The pertinent provision of § 6, as inserted by St. 1975, c. 808, § 3, reads: "Except as hereinafter provided, a zoning . . . by-law shall *not apply to* structures or uses *lawfully in existence or lawfully begun,* or to a building or special permit issued before the first publication of notice of the public hearing on such . . . by-law . . ." (emphasis supplied).

[8]Delphic also asks that we make findings in its favor on the issue of abandonment. In light of the conclusion we reach on Delphic's other arguments, we need not consider this request.

[9]As Delphic has made no argument on appeal that, apart from its effect on Delphic's status pursuant to c. 40A, § 6, the limitations provision in § 7, standing alone, requires reversal of the judgment, we do not consider it.

[10]Delphic does not challenge art. 4.3's requirement for site plan approval. Rather, Delphic appears to limit its argument to the portion of art. 4.3 establishing the special permit requirement. See *Biotti* v. *Selectmen of Manchester*, 25 Mass. App. Ct. 637, 640-641 (1988).

this argument below, see *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 88 (1977), and cases cited; *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471 n.25 (1991); *R.W. Granger & Sons, Inc.* v. *J&S Insulation, Inc.*, 435 Mass. 66, 73-74 (2001), it also has failed to call to our attention any circumstances that would justify our departure from a fundamental principle of appellate practice, viz., that we need not consider issues raised for the first time on appeal. Contrast *McLeod's Case*, 389 Mass. 431, 434 (1983); *White* v. *White*, 40 Mass. App. Ct. 132, 133-134 (1996) (issue addressed where injustice might otherwise result); *Atlas Tack Corp.* v. *DiMasi*, 37 Mass. App. Ct. 66, 71 (1994) (where no opportunity to present question of law in trial court, interests of judicial economy warranted consideration of the issue). Cf. *Matter of a R.I. Grand Jury Subpoena*, 414 Mass. 104, 111 (1993) (although party had no standing to bring appeal, Supreme Judicial Court addressed issue in order to provide guidance to trial courts).

For these reasons, we decline to consider Delphic's argument concerning the validity of the special permit portion of art. 4.3 of the by-law as in effect in 1984.

b. *Equivalency of site plan approval and special permit.* Because the planning board was the site plan approval *and* special permit granting authority and because the standards for both the approval and the permit were, according to Delphic, "virtually identical," Delphic maintains that we should deem the planning board's approval of its site plan as also being a grant of the special permit required under art. 4.3. Delphic's argument on this issue, as we understand it, is that the planning board made an undisclosed or unexpressed determination that either the proposed use complied with the by-law or that no special permit was required. Citing *Y.D. Dugout, Inc.* v. *Board of Appeals of Canton*, 357 Mass. 25 (1970), and *Prudential Ins. Co. of America* v. *Board of Appeals of Westwood*, 23 Mass. App. Ct. 278 (1986), Delphic contends that the only distinction between the site plan approval and special permitting process was the presence or absence of discretion vested in the permit granting authority.

We do not give these cases the same broad reading as does Delphic. Rather, we read them as establishing the extent to

which a city or town, in conformity with G. L. c. 40A, may exercise site plan review as a means to regulate land uses *allowed as of right*. See *Y.D. Dugout, Inc.* v. *Board of Appeals of Canton*, 357 Mass. at 31-32; *Prudential Ins. Co. of America* v. *Board of Appeals of Westwood*, 23 Mass. App. Ct. at 280-282. See also *Osberg* v. *Planning Bd. of Sturbridge*, 44 Mass. App. Ct. 56, 57-59 (1997). As the planning board approved Delphic's site plan, the real question before us is whether that approval constituted a grant of the required special permit. For the following reasons, we conclude that it did not.

Because site plan review is created by ordinance and by-law rather than by statute, see *St. Botolph Citizens Comm., Inc.* v. *Boston Redev. Authy.*, 429 Mass. 1, 8 n.9 (1999); *Cumberland Farms, Inc.* v. *Planning Bd. of Bourne*, 56 Mass. App. Ct. 605, 608 n.6 (2002), we look to the Wrentham zoning by-law. In doing so, we first note that the provisions of the by-law controlling site plan approval and those controlling special permits appear in separate articles, that is, arts. 7 and 9, respectively. See *Osberg* v. *Planning Bd. of Sturbridge*, 44 Mass. App. Ct. at 59, where this court stated that "the by-law, by utilizing separate chapters, clearly differentiates between processing of applications for site plan review and applications for special permits."

The requirements of arts. 7 and 9 are set out in the margin.[11] There is nothing in the planning board's decision that suggests

---

[11]Article 7 of the by-law requires that the board's decision to approve, modify, or reject a site plan

> "be based upon a determination that the site plan as approved or modified will have an acceptable environmental impact, will be consistent with the land use objectives of the Town, will comply with the purpose of these zoning bylaws . . . and will comply with these zoning bylaws, bylaws or regulations of the Town and applicable laws and regulations of the Commonwealth."

Article 9 prohibits approval of a special permit application unless it is determined that the proposed use

> "a. shall not have vehicular and pedestrian traffic of a type and quantity so as to adversely [a]ffect the immediate neighborhood;

> "b. shall not have a number of residents, employees, customers, or visitors so as to adversely [a]ffect the immediate neighborhood;

> "c. shall not have a greater lot coverage than allowed in the zoning district . . . ;

that it even considered the required factors set out in art. 9.[12] See *Britton* v. *Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. 68, 74 n.6 (2003) ("The standards and criteria the board actually used in conducting its analysis are typically apparent on the face of the decision"). Cf. *Whitten* v. *Board of Appeals of Woburn*, 38 Mass. App. Ct. 949, 950 (1995) (where applicant obtained fuel license, but not special permit required to sell fuel, no indication in the record that, in granting license, city council had considered possibility of fuel sales). Rather, the planning board's decision simply recites that Delphic's application for site plan review had been granted subject to conditions that are unrelated to the factors enumerated in art. 9.

Moreover, the planning board had the discretionary power to deny a special permit even had Delphic demonstrated that it had satisfied the conditions set out in art. 9, see *Humble Oil & Ref. Co.* v. *Board of Appeals of Amherst*, 360 Mass. 604, 605 (1971); *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. 349, 355 (2001); *Britton* v. *Zoning Bd. of Appeals of Gloucester*, 59 Mass. App. Ct. at 74-75, provided its action was neither "based on a legally untenable ground" nor "unreasonable, whimsical, capricious, or arbitrary." *Roberts* v. *Southwestern Bell Mobile Sys., Inc.*, 429 Mass. 478, 486 (1999), quoting from *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970). Cf. *Whitten* v. *Board of Appeals of Woburn*, 38 Mass. App. Ct. at 950 (notwithstanding fact that city council had issued fuel license, if plaintiff had applied for special permit for sale of fuel, city council would have had discretion to deny it based on "degree of use to which the fuel license would be put").

---

"d. shall not be dangerous to the immediate neighborhood or the premises through fire, explosion, emission of wastes, or other causes;

"e. shall not create such noise, vibration, dust, heat, smoke, fumes, odor, or glare or other nuisance or serious hazard so as to adversely [a]ffect the immediate neighborhood;

"f. shall not adversely [a]ffect the character of the immediate neighborhood."

[12]Moreover, and as earlier noted, see note 3, *supra*, there is nothing in the record before us to show that Delphic ever requested the planning board to consider whether it should be granted a special permit.

We conclude that in light of the differences between arts. 7 and 9, and in the absence of specific findings in respect to a special permit, the planning board's approval of Delphic's site plan does not constitute the functional equivalent of a special permit.

c. *Lawful nonconforming status acquired by virtue of G. L. c. 40A, § 7.* As framed and argued by Delphic and as responded to by the board, the only remaining issue before us is whether uses that are immune from zoning enforcement actions under § 7 acquire nonconforming status under that provision of § 6 set out in note 7, *supra.*[13]

Section 7, second par., first proviso, as appearing in St. 1989, c. 341, § 21, provides as to uses, in relevant part[14]:

"[I]f real property has been improved and used in accordance with the terms of the original building permit . . . no action . . . the effect or purpose of which is to compel the abandonment, limitation or modification of the use allowed by said permit . . . by reason of any alleged

---

[13]The only support cited by Delphic for this argument, that uses protected from enforcement under § 7 acquire nonconforming status under § 6, is *Durkin* v. *Board of Appeals of Falmouth,* 21 Mass. App. Ct. 450 (1986). There the court held that use of property by the Federal government that was immune from the application of local zoning regulations due to Federal supremacy could be considered a prior lawful nonconforming use because of that immunity and the fact that the "noncompliance [was] not highly significant." *Id.* at 454. While *Durkin* suggests that a use that has gained the benefit of the six-year limitation period set out in § 7 "perhaps should be treated as a lawfully nonconforming structure or use," Healy, Massachusetts Zoning Manual § 13.2.3, at 13-8 (Supp. 2002); see Bobrowski, Massachusetts Land Use and Planning Law § 7.04[D][3] (2d ed. 2002), it does not so hold. Cf. *Commonwealth* v. *Shea,* 46 Mass. App. Ct. 196, 198-199 n.3 (1999). Moreover, we see nothing in *Lapidus* v. *Board of Appeal of Boston,* 51 Mass. App. Ct. 723 (2001), that gives support to Delphic's argument. Rather, analogizing the Boston zoning enabling act to G. L. c. 40A, § 7, we held, *id.* at 726-727, that a complaint seeking revocation of a permit issued twenty-three years earlier was barred. Nothing in *Lapidus* remotely suggests that our holding was based upon a conclusion that the use in issue had become a lawful nonconforming use.

[14]Although c. 40A, § 7, also provides for a ten-year limitations period for zoning violations unsanctioned by any permit, that provision pertains only to structural violations. See *Lord* v. *Zoning Bd. of Appeals of Somerset,* 30 Mass. App. Ct. 226, 227-228 (1991). See also *Cumberland Farms, Inc.* v. *Zoning Bd. of Appeals of Walpole,* 61 Mass. App. Ct. 124, 125 n.4 (2004).

violation of the provisions of this chapter, or of any . . .
by-law adopted thereunder, shall be maintained, unless
such action . . . is commenced . . . within six years next
after the commencement of the alleged violation of law."

We begin our analysis with the plain and unambiguous
language of c. 40A, § 6. See *Hoffman* v. *Howmedica, Inc.*, 373
Mass. 32, 37 (1977). In so doing, we cover familiar ground. As
noted from the outset, the plain and pertinent language of § 6
authorizes an exemption only for "structures or uses lawfully in
existence or lawfully begun, or to a building or special permit
issued before the first publication of notice of the public hear-
ing on such . . . by-law . . . ." It follows from the clear
language of § 6 that it applies only to those uses that were law-
fully existing prior to the enactment of the zoning by-law or
prior to enactment of a by-law amendment that rendered
Delphic's use noncompliant. See *Derby Ref. Co.* v. *Chelsea*,
407 Mass. 703, 708 (1990); *Hall* v. *Zoning Bd. of Appeals of
Edgartown*, 28 Mass. App. Ct. 249, 256-257 (1990); *Mendes* v.
*Board of Appeals of Barnstable*, 28 Mass. App. Ct. 527, 528-
529 (1990).

In respect to nonconforming structures, we recently stated
that the "limitations period of G. L. c. 40A, § 7, does not render
[a] prior structure lawful [for the purpose of § 6], just immune
from enforcement action." *Cumberland Farms, Inc.* v. *Zoning
Bd. of Appeals of Walpole*, 61 Mass. App. Ct. 124, 127 n.9
(2004). We can think of no valid reason why a different principle
should apply to prior unlawful uses. Consequently, we decline
to construe the expiration of the six-year limitation period set
out in § 7 as converting an initially unlawful use to a lawful
use, as if by a belated or constructive grant of right. See *ibid.*
Cf. *Mendes* v. *Board of Appeals of Barnstable*, 28 Mass. App.
Ct. at 528-531 (use maintained under variance has no claim to
status as prior lawful nonconforming use, which comes from
preexisting right and not "through the after-the-fact dispensa-
tion of a variance").

Our conclusion is supported by other considerations. First,
there is the plain language of § 6, which omits any explicit
reference to uses protected under § 7. See *General Elec. Co.* v.
*Department of Envtl. Protection*, 429 Mass. 798, 803 (1999).

There is also the fact that the Legislature expressly provided for the relief to be accorded for unlawful uses commenced pursuant to an original building permit, viz., a limitation on the time during which others might initiate judicial proceedings to enforce zoning regulations.[15] Were we to construe § 6 as applying to uses protected from enforcement by § 7, we would impermissibly augment the extent of that relief. See *Keene* v. *Brigham & Women's Hosp., Inc.*, 439 Mass. 223, 238 (2003) ("We are bound to give [a statute] the scope intended by the Legislature"). Section 7 expressly limits its application to the use originally allowed by a building permit. See § 7, second par. (six-year statute of limitations applies if "property has been improved and used *in accordance with the terms of [an] original building permit*" [emphasis supplied]).[16]

We have also considered the fact that our reading of § 6 is consistent with the policy expressed in case law and the legislative history of § 6, that is, the elimination of nonconforming uses. See *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. 32, 39 (1991); *Davis* v. *Zoning Bd. of Chatham*, 52 Mass. App. Ct. at 357-358; Report of the Department of Community Affairs Relative to Proposed Changes and Additions to the Zoning Enabling Act, at 39 (1972) (House of Rep. Bill No. 5009).

3. *Conclusion.* It follows from what we have said that, notwithstanding any application of the statute of limitations provision in G. L. c. 40A, § 7, to Delphic's property, Delphic's unlawful use is not thereby converted to a lawful nonconforming use under G. L. c. 40A, § 6.

Paragraph two of the judgment is modified to provide, "The use of the property as a truck maintenance and repair facility is

---

[15]Because the parties have not raised the question of whether any protection enjoyed by Delphic under § 7 extends to Delphic's successors in interest, we do not consider it.

[16]A city or town may, however, subject to the requirements set out in § 6, authorize the extension or alteration of a lawful nonconforming use. See *Cox* v. *Board of Appeals of Carver*, 42 Mass. App. Ct. 422, 425-426 (1997). See also *Blasco* v. *Board of Appeals of Winchendon*, 31 Mass. App. Ct. 32, 35-39 (1991). A permit allowing such extension or alteration may be treated as the "original building permit" contemplated by § 7. See *Cape Resort Hotels, Inc.* v. *Alcoholic Lic. Bd. of Falmouth*, 385 Mass. 205, 218 (1982).

not a pre-existing nonconforming use under G. L. c. 40A, § 6, and such use is subject to the current requirements of arts. 4.2 and 15 of the Wrentham zoning by-law." As so modified, the judgment is affirmed.

*So ordered.*