IMPRIMIS INVESTORS, LLC, & another[1] vs. KPMG PEAT
MARWICK LLP.

No. 05-P-1462.

Suffolk. September 22, 2006. - June 4, 2007.

Present: PERRETTA, McHUGH, & COHEN, JJ.

*Auditor. Fraud. Negligence,* Misrepresentation. *Contract,* Misrepresentation. *Consumer Protection Act,* Availability of remedy. *Practice, Civil,* Appeal, Notice of appeal, Theory of recovery.

This court concluded that the appeal of the second of two plaintiffs in a civil action was properly before the court, where the notice of appeal filed by the first plaintiff clearly provided the defendant notice of the second plaintiff's intent to be included as an appellant in the appeal. [219-221]

This court decided to consider an issue raised for the first time on appeal, where the issue appeared to be unresolved, the parties had addressed the issue at length in their briefs and at oral argument, the voluminous record appendix contained all the materials cited by the parties in their briefs in addressing the issue, and the court's analysis of the question would be no more than an extension of the reasoning of the trial judge and would not disturb the judgment. [221-222]

In a civil action brought by certain investors against a company's independent auditor for fraud and negligent misrepresentation, based on the auditor's final report of the company's financial statements, the judge properly granted summary judgment in favor of the auditor, where there was no showing that the auditor made any assurances to the investors at any time before they committed to a loan agreement with the company, and nothing to show, directly or inferentially, that any assurances given by the company to the investors were given with the actual knowledge or consent of the auditor [228-230]; further, the judge properly granted summary judgment in favor of the auditor on the investors' claim of violations of G. L. c. 93A, § 11, where there was no business relationship between the investors and the auditor [230-231].

CIVIL ACTION commenced in the Superior Court Department on November 4, 1999.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment.

[1] Wexford Spectrum Investors, LLC.

*Jody L. Newman* for the plaintiffs.

*Lisa C. Wood* (*Benjamin L. Wilson* with her) for the defendant.

PERRETTA, J. After losing their substantial investment in First New England Dental Centers, Inc. (the company), Imprimis Investors, LLC (Imprimis), and Wexford Spectrum Investors, LLC (Wexford) (the investors, when referred to jointly), brought an action against the company's independent auditor, KPMG Peat Marwick LLP (Peat Marwick), alleging fraud, negligent misrepresentation, and violations of G. L. c. 93A, § 11, based on its final audit report of the company's 1996 financial statements.[2] Concluding on the undisputed facts that the investors had not had any contact or other activity with Peat Marwick prior to their investment and had not relied upon its final audit report of the company at the time of their investment, the judge denied the investors' motion for summary judgment and granted that of Peat Marwick. The principal issue before us is whether Peat Marwick can be held liable to the investors on the theory that the investors had indirectly relied on the assurances that Peat Marwick made to them by way of the company's executives. Based upon the materials contained in the record appendix before us, we affirm the judgment.

1. *Threshold issues.* Before taking up the underlying facts of the parties' dispute, we consider two threshold issues: (a) whether Wexford's appeal is properly before us; and (b) whether the investors can raise a new theory of liability on appeal.

a. *Wexford's appeal.* Peat Marwick contends that the only appellant before us is Imprimis and that Wexford's appeal must be dismissed due to its failure to comply with the specificity requirement of Mass.R.A.P. 3(c), as amended, 430 Mass. 1602 (1999), that is, that "[t]he notice of appeal shall specify the party or parties taking the appeal." The timely filed notice of appeal indicates that "Imprimis Investors, LLC et al./Plaintiffs" were appealing from the judgment.

After the time for taking an appeal from the judgment had expired, the attorneys representing both Imprimis and Wexford

---

[2]The investors also asserted a negligent misrepresentation claim against three of the company's executives and directors. The action against these individual defendants was dismissed during litigation in Superior Court.

sought the permission of a single justice of this court for leave to allow Wexford to be named as an additional appellant in this matter. A filing fee in the appropriate amount accompanied the request. The motion was denied without prejudice to its renewal upon a showing of excusable neglect and the existence of meritorious appellate issues. Within four days thereafter, counsel for Wexford renewed their motion and made the requisite showing. The motion was allowed and payment of a separate entry fee was accepted.

There is no indication on our docket that Peat Marwick opposed the motion or, assuming a lack of notice, sought reconsideration of the ruling. Rather, it appears that Peat Marwick first complained about Wexford's participation in this appeal in a footnote in the "statement of the facts" portion of its brief, in which it stated that "et al." does not meet the specificity requirement of rule 3(c), citing *Filios* v. *Commissioner of Rev.*, 415 Mass. 806, 807 n.2 (1993), cert. denied, 511 U.S. 1030 (1994), and *Cummings* v. *City Council of Gloucester*, 28 Mass. App. Ct. 345, 347-349 (1990).

Those cases are inapposite. Each involves numerous and unrelated appellants in the caption or body of the notice of appeal, whereas in the present case, there has never been more than two plaintiffs, Imprimis and Wexford. The caption, body, and signature block sections of the notice of appeal indicate that "Imprimis Investors, LLC et al./Plaintiffs" were appealing from the judgment. Although Wexford was not specified by name in the notice of appeal, Imprimis and Wexford are the only plaintiffs named in the judgment. Moreover, Peat Marwick collectively referred to the investors as "Wexford" in its summary judgment papers, and it used the same designation, that is, "Imprimis Investors LLC, et al, Plaintiffs" in the pleadings it filed in Superior Court.

It is established that a notice of appeal will not be deemed defective under rule 3(c) if it fairly informs the court and the opposing parties which specific parties are pursuing an appeal. See *Board of Appeals of Rockport* v. *DeCarolis*, 32 Mass. App. Ct. 348, 351 (1992); *Deveau* v. *Commissioner of Rev.*, 51 Mass. App. Ct. 420, 425 n.10 (2001); *Palriwala* v. *Palriwala Corp.*,

64 Mass. App. Ct. 663, 667-669 (2005). See also Fed.R.A.P. 3(c)(1)(A).[3]

In view of all the circumstance before us, including but not limited to the pleadings, the course of the litigation, the judgment, and the contents of the notice of appeal, we conclude that the notice of appeal clearly provided Peat Marwick notice of Wexford's intent to be included as an appellant in the appeal before us.

b. *The investors' present theory of liability.* In their complaint against Peat Marwick, the investors alleged that in deciding to invest in the company, they relied to their detriment upon Peat Marwick's final and signed audit report as well as its unqualified opinion based on the company's 1996 financial statements. They also claimed that the company's financial statements, which were audited by Peat Marwick, contained a number of specific and material misrepresentations and omissions.

At the time of the summary judgment stage of the litigation, the investors maintained that they relied upon an unsigned draft audit report allegedly provided to their attorneys on the day of the closing of their loan to the company. The judge found that there was no record evidence that the investors had received the audit report before funding the loan, and therefore, the judge concluded that the investors could not succeed on any claim grounded upon reliance on any representation from Peat Marwick.

On appeal, the investors concede that they had not received the unsigned audit report until after they had closed on the loan. They argue, instead, that the judge erred as matter of law in concluding that they could not rely upon Peat Marwick's ultimately issued audit report simply because they had not received it at the time of the closing. The investors now argue that because Peat Marwick knew of the circumstances of the loan, they reasonably relied upon Peat Marwick's "pre-closing representations conveyed to [them] by the [company]" prior to the funding of the loan.

It is a long-standing rule of appellate practice that an issue

---

[3]As amended in 1993, Fed.R.A.P. 3(c)(1)(A) reads in pertinent part: "[A]n attorney representing more than one party may describe those parties [in the notice of appeal] with such [general] terms as 'all plaintiffs, the defendants [or] the plaintiffs A, B, et al.' . . ."

raised for the first time on appeal will not be considered. See *Boston Water & Sewer Commn.* v. *Commonwealth*, 64 Mass. App. Ct. 611, 618 (2005). There are, however, exceptions to the general rule. See *Bruno* v. *Board of Appeals of Wrentham*, 62 Mass. App. Ct. 527, 532 (2004). Although the instant case does not squarely fall within the exceptions discussed in the *Bruno* case, we nonetheless think that the investors' argument presents an appropriate occasion for us, within the spirit and comprehension of the existing case law, to make an exception to the general rule for the following reasons. See *ibid.*

In Massachusetts, the question of liability based upon indirect reliance appears to be unresolved. In the present instance, the investors make their argument on the basis of the materials before us on the cross motions for summary judgment, materials that are to be viewed in the light most favorable to the party against whom such a judgment is sought, in this instance, Peat Marwick. See *M.P.M. Builders, LLC* v. *Dwyer*, 442 Mass. 87, 89 (2004). Moreover, the parties have addressed the issue now before us at length in their briefs and at oral argument. Further, and importantly, the voluminous record appendix before us contains all the materials cited by the parties in their briefs in addressing the issue now presented. Finally, our analysis of the question is really no more than an extension of the reasoning of the judge based upon the facts and conclusions found and reached by him and does not disturb the judgment.

2. *The facts.* We set out the undisputed facts, noting where there was information in the record to show a dispute about the events leading up to the closing of the loan. On December 6, 1996, Peat Marwick issued an unqualified audit opinion on the company's financial statements "for the year ended December 31, 1995, and the nine months ended September 30, 1996."[4] The company then filed, on January 31, 1997, an S-1 registration statement with the Securities and Exchange Commission (SEC) accompanied by its 1995 and 1996 financial statements and Peat Marwick's unqualified audit report.

---

[4]As explained by the judge in his memorandum of decision, "[a] clean or unqualified audit report does not contain a going concern modification or qualification, and connotes an auditor's belief that a company can continue as a 'going concern' for a 12-month period from the date of the [financial statements] or, in this case, until December 31, 1997."

Notwithstanding the company's S-1 registration statement, Peat Marwick had sometime earlier informed the company of its concerns over the company's liquidity and ability to continue as a "going concern." Nonetheless, Peat Marwick was willing to issue the unqualified audit report for the first nine months of 1996, because of the assurances of the company's chief executive officer, John Lakian, that he would continue to obtain financing.

It is against this backdrop that the company and the investors held their introductory meeting on July 3, 1997, followed by a series of communications between them regarding a possible loan. Peat Marwick was not a party to this meeting or the subsequent communications.

On July 23, 1997, the investors agreed to invest $14.5 million in senior secured notes issued prior to the company's initial public offering (IPO), subject to certain conditions set out in a note purchase agreement (agreement) with the investors. The investors' money was to act as a bridge until the company issued an IPO sometime after Labor Day, 1997. The agreement contained the requirement that Peat Marwick issue an audit report on the company's financial statements as of December 31, 1996, without a "going concern" qualification, the field work for which Peat Marwick had completed in March, 1997. Peat Marwick was not a party to the agreement.

Prior to entering into the agreement, the investors, represented by counsel and with the company's assent, obtained detailed information concerning the company's finances from the company and its investment bankers. At no time did the investors either seek or obtain any information about the company from Peat Marwick.[5]

A "wire closing" occurred on Friday, July 25, 1997, that is to say, the company and its attorneys and the investors and their attorneys exchanged the closing documents by facsimile transmission, and the investors transferred most of the loan funds. Although Peat Marwick had completed its audit report before July 25, it refused to issue a clean report until the company first received all the promised funds from the inves-

---

[5]As of July 3, 1997, the company had defaulted once on a $6 million loan from Fleet Bank and was in danger of a second default.

tors, which would remove its noted concerns about the company's liquidity. The investors transferred the remaining funds on Monday, July 28, 1997.

In its completed dual-dated report,[6] Peat Marwick stated that it had conducted its audit "in accordance with generally accepted auditing standards."[7] Peat Marwick opined in its report that the company's financial statements, which were the responsibility of the company's management, "present[ed] fairly, in all material respects, the financial position of [the company] . . . and the results of their operations and their case flows . . . in conformity with generally accepted accounting principles."[8] The unqualified report did not contain a "going concern" paragraph, see note 4, *supra*, and thereby indicated that Peat Marwick had no substantial doubt that the company would continue as a going concern for a reasonable period of time, not to exceed one year from the date of the company's financial statements, i.e., December 31, 1997.

On October 23, 1997, the company filed a registration statement with the SEC. At that time, the company was advised by

---

[6]The report was dated "March 28, 1997, except as to paragraph 4 of Note 11, which is as of July 25, 1997." That paragraph reads:

> "On July 25, 1997, [the company] raised net proceeds of approximately $14,000,000 through a private debt offering. The proceeds from the offering will be used for working capital, acquisition of dental facilities and repayment of the bank line of credit. [The company's] management believes the proceeds will be sufficient to address their current liquidity requirements."

[7]It was, however, the opinion of the investors' expert that Peat Marwick had violated generally accepted fundamental standards in conducting the audit, that is, it had failed "to challenge management representations and exercise professional skepticism." The expert expressed the view that Peat Marwick had failed to exercise due care in conducting its audit by failing to evaluate the company's representation that the net proceeds of the investors' loan would be sufficient to remove substantial doubt about the company's ability to continue as a going concern.

[8]In *Reisman* v. *KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 103 n.3 (2003), the court noted:

> "Financial statements are generated by a corporation's management. The auditor's duty is to express an opinion on whether the financial statements conform to generally accepted accounting principles based upon audits conducted in conformance with generally accepted accounting standards. See Shore, Watching the Watchdog: An Argument for Auditor Liability to Third Parties, 53 SMU L. Rev. 387, 389 (2000)."

its investment bankers that the company's IPO could go forward only in the event the company showed signs of becoming profitable. The company never became profitable, and the IPO was never approved. On February 13, 1998, the company filed for bankruptcy.

3. *The judge's decision.* Although Peat Marwick was not a party to the agreement of July 23, 1997, between the company and the investors, the judge drew the inference that Peat Marwick was aware of that agreement and its requirements concerning the audit report. He nonetheless concluded that, as matter of law, the investors could not show that Peat Marwick, in preparing its audit report, did so with the intent to influence the investors to enter into the agreement, or that the investors relied on Peat Marwick's audit report at the time of the closing on the loan. The latter conclusion was based on the judge's determination that "[n]o one . . . at the closing or at [Peat Marwick] is able to testify when the Audit Report and the 1996 [financial statements] were actually delivered to [the investors]."

In so concluding, the judge relied upon *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. 491 (1998); *Reisman* v. *KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100 (2003); and Restatement (Second) of Torts § 552(1) (1977). The judge noted that his conclusion made it unnecessary for him to consider a number of additional issues raised by the investors.[9] He did, however, consider the investors' G. L. c. 93A claim, which was based upon the company's 1996 financial statements. On this claim, the judge determined that the 1996 financial statements were representations made by the company and that the investors had no relationship or contact with Peat Marwick, whose only duty in respect to the financial statements was to express an opinion based upon generally accepted accounting standards. See note 8, *supra.* As put by the judge:

> "Without more, sloppy auditing of financial statements and the resulting production of an inaccurate audit report that finds its way into the hands of a lender to, or investor in, the accountant's client, *after* the closing on the loan or

[9]As of July 3, 1997, the company had defaulted once on a $6 million loan from Fleet Bank and was in danger of a second default.

investment, is neither unfair nor deceptive, nor is it immoral, unethical, oppressive, or unscrupulous, particularly with regard to the non-client lender or investor." (Emphasis added.)

See note 7, *supra*, setting out the opinion of the investors' expert that Peat Marwick violated generally accepted fundamental standards in conducting its audit.

4. *The investors' appeal.* Although the investors acknowledge the fact that they closed on the loan before receiving Peat Marwick's audit report, they argue on appeal that the summary judgment materials demonstrate that they can prove that they actually relied on Peat Marwick's unqualified opinion before the transfer of their funds. In so arguing, the investors correctly concede that there is nothing in the summary judgment materials to show that they had any direct contact of any kind with Peat Marwick throughout the time pertinent to their appeal.

Instead, the investors' contention on appeal is that the summary judgment materials show that (1) Peat Marwick had concerns about the unreliability of the company's 1996 financial statements; (2) in March, 1997, Peat Marwick refused to issue an unqualified audit opinion until the company received financing sufficient to meet its foreseeable obligation; (3) while Peat Marwick promised the company a clean audit opinion upon sufficient financing, it simultaneously informed the company of its many and serious accounting problems that reduced the credibility of the company's financial statements; (4) during the investors' introductory meeting with the company on July 3, 1997, the investors learned that their financing would eliminate Peat Marwick's "going concern" issue and result in an unqualified audit report; (5) Peat Marwick knew of the investors' potential investment as well as the proposed financing terms; (6) from the time of the meeting on July 3, 1997, the investors relied on Peat Marwick's anticipated audit report in deciding to invest in the company; (7) the investors understood the representations contained in an unqualified audit report without the necessity of physical possession of the formal report; and (8) although the investors made Peat Marwick's unqualified opinion a condition of their loan, Peat Marwick would not release the opinion in writing until after the loan had been

funded because its unqualified opinion was dependent upon the investors' financing.[10] They contend that the circumstances set out in note 10, *supra*, and the opinion of the expert as related in note 7, *supra*, establish that the judge erred in granting summary

[10]In support of the investors' argument that they "actually relied on [Peat Marwick's] unqualified audit opinion before funding the loan because [Peat Marwick's] pre-closing representations conveyed to [them] by [the company] assured [them] that its financing would produce an unqualified audit opinion," the investors cite to the following facts found in the summary judgment materials:

Charles Davidson, the investors' chairman, referred to the meeting of July 3, 1997, a meeting between the investors' principals and the company's executives, as a "sales effort" or "pitch." At this meeting, the company's founder and chief executive officer, John Lakian, and Donald Strange, another executive of the company, indicated to Davidson that the company was in the middle of its year-end audit with Peat Marwick, that final reports would be available in a month or so, that Peat Marwick was having "going concern" issues with the company, and that part of any loan proceeds would be used to pay off the $6 million loan that was in arrears, see note 5, *supra*, which would "put the company in a position where it could convince the auditors to give them a clean opinion."

According to one of the investors' representatives at this meeting, Zachary Goldwyn, Lakian presented the matter as a business opportunity to invest $15 million in bridge financing until an IPO was issued shortly after Labor Day. Lakian further represented, according to Goldwyn, that the company was "definitely" going public.

Shortly after the July 3 meeting, Lakian informed Alfred Woollacott, Peat Marwick's lead auditor, that the company "got the deal done" and that the company was going to receive $12 million to $15 million. Woollacott indicated that he was "delighted" with the news and that the company should close on the loan.

Kenneth Rubin, one of the investors' executive officers, related that both Davidson and Joseph Jacobs, another executive in the investors' companies, informed him that it was essential for the investors to obtain the clean audit report before the closing. When a dispute arose concerning the timing of the production of Peat Marwick's clean audit opinion, the attorneys for the company and the investors agreed that a clean audit report and the closing on the loan would occur simultaneously. At this time, the company represented that $15 million would be sufficient to keep the company going through 1997.

In the time period between the July 3 meeting and the date of the agreement, July 23, Jacobs gave explicit directions to his subordinates not to close on the loan without receipt of the unqualified audit report from Peat Marwick because in the absence of such an opinion, an IPO would not occur and the investment would fail. In an internal electronic mail message dated July 21, 1997, Jacobs stated that "under no circumstances should this loan be made unless we receive at the same time or prior thereto, the signed audited [financial statements]."

judgment to Peat Marwick on their claim brought under G. L. c. 93A.

5. *Discussion.* In *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 497-498, the court adopted the standard embodied in Restatement (Second) of Torts § 552(2) concerning the liability described in § 552(1). Section 552(1) reads, in pertinent part:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

Section 552(2) provides, again as here relevant, that an auditor's liability is limited to:

> "loss suffered (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends."

In construing the applicable provisions of the Restatement, the *Nycal* court concurred with the conclusion of the California Supreme Court in *Bily* v. *Arthur Young & Co.*, 3 Cal. 4th 370 (1992), that § 552 " 'recognizes commercial realities by avoiding both unlimited and uncertain liability for economic losses in cases of professional mistake and exoneration of the auditor in situations where it clearly intended to undertake the responsibility of influencing particular business transactions involving third persons.' *Id.* at 408." *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 497-498.

We fail to find in the materials before us any showing that Peat Marwick, rather than executives of the company, made assurances to the investors at the meeting of July 3, 1997, or at any time before their loan commitment. The investors' reliance on *Cherry* v. *Joseph S. Herbert & Co.*, 212 A.D.2d 203 (N.Y.

1995), is misplaced.[11] In that case, the plaintiffs were able to prove reliance on an audit report that was not issued until after an investment was made where the accountants participated in meetings with the plaintiffs prior to the closing and gave verbal assurances directly to them. *Id.* at 208. Moreover, there is nothing in the materials before us to show, directly or inferentially, that any assurances given by the company to the investors were given with the actual knowledge or consent of Peat Marwick.[12] See *Nycal Corp.* v. *KPMG Peat Marwick LLP*, 426 Mass. at 498; *Spencer* v. *Doyle*, 50 Mass. App. Ct. 6, 13 (2000).

Nor are we persuaded by the investors' argument that their actual reliance on Peat Marwick's audit report is established by the timing of the closing on the loan and Peat Marwick's understanding that an unqualified audit opinion was a condition of the loan agreement. As earlier related, the materials submitted on the motions for summary judgment show that (1) Peat Marwick was concerned from the outset about the company's liquidity and ability to continue as a going concern without the infusion of capital; (2) prior to entering into the agreement of July 23, 1997, the investors obtained counsel as well as detailed information concerning the company's finances from the company and its investment bankers; (3) at no time during the time period relevant to the issue on appeal did the investors either seek or obtain any information about the company from Peat Marwick; and (4) after the meeting of July 3, 1997, Peat Marwick's lead auditor was advised by the company's founder and chief executive officer that the company would be receiving funds in the amount of somewhere between $12 million and $15 million. See note 10, *supra*.

Although there was to be a simultaneous exchange of the loan proceeds and a delivery of the signed audit report, reflect-

---

[11]Pursuant to § 19.8 of the agreement, its provisions were controlled by the law of New York.

[12]While it may be reasonable to infer that Peat Marwick knew or should have anticipated that the company would supply Peat Marwick's written audit report to the investors, we think it unreasonable to infer that Peat Marwick's alleged oral statements concerning the contents of its future report would be conveyed to the investors or that any such information conveyed by the company to the investors would be relied on by the investors. See *Quigley* v. *Bay State Graphics, Inc.*, 427 Mass. 455, 462 (1998).

ing receipt of the investors' funds, a problem occurred with the transmission of funds, and the funds were not completely transferred until July 28, 1997. While Peat Marwick's audit report was fully prepared by July 25, 1997, it did not issue, or agree to issue, its completed audit report until all the investors' funds had been transferred. Moreover, and contrary to the express directive of their superior officer, see note 10, *supra*, the investors' representatives chose to go forward on the loan without first having received Peat Marwick's audit report.

In short, Peat Marwick did not agree to supply information for the investors' guidance. To the contrary, it refused to provide its "clean" audit report to the company until the investors acted on their independently formed investment decision. And, regardless of what Peat Marwick agreed to do, it did not actually deliver its report until after the investors had parted with their funds. Under either view, there was no reliance of the type required by Restatement (Second) of Torts § 552(2).

When the company failed to produce Peat Marwick's audit report at the closing on July 25, it was open to the investors to preserve their rights with respect to that report without parting with their money in at least two ways. They could have refused to fund the loan and have made the company's failure to produce the clean audit report an issue, or they could have sought to place the loan proceeds in escrow pending receipt of the report. They did neither and, instead, elected to complete funding of the loan despite the fact that they had yet to receive Peat Marwick's final audit report. Under the law of New York, see note 11, *supra*, the investors' performance of their contractual obligations in those circumstances amounts to a waiver of the condition of prior receipt of Peat Marwick's audit report. See *Scavenger, Inc.* v. *GT Interactive Software, Inc.*, 273 A.D.2d 60, 60 (N.Y. 2000). See also 13 Williston, Contracts § 39.31 (4th ed. 2000).

Turning to the investors' claim under G. L. c. 93A, § 11, we begin with the established principle that the absence of privity of contract does not bar a claim under the statute "so long as the parties [were] engaged in more than a minor or insignificant business relationship." *Standard Register Co.* v. *Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (1995). In the present case, however, there was no business relationship between the

investors and Peat Marwick. The investors had no contact with Peat Marwick, and Peat Marwick played no active role in the loan transaction. Contrast *Reisman* v. *KPMG Peat Marwick LLP*, 57 Mass. App. Ct. at 125a-125b. Moreover, in the circumstances presented, it cannot be said that the investors relied upon Peat Marwick's report in funding the loan when the facts establish that they closed on the loan without the report.

5. *Conclusion.* It follows from what we have said that the judge was not in error in granting summary judgment to Peat Marwick on all the investors' claims.[13]

*Judgment affirmed.*

---

[13]Our conclusion makes it unnecessary for us to consider Peat Marwick's cross appeal, in which it argues that it was entitled to a dismissal of the investors' complaint on the basis of a settlement agreement entered into between the company and its creditors in the bankruptcy action. Although Peat Marwick was a general unsecured creditor of the company, it was not a signatory to that settlement agreement. A Superior Court judge had earlier converted Peat Marwick's motion to dismiss into one for summary judgment and then denied the motion on the basis that even if the language of the release were unambiguous, the release was ambiguous in its application. Were we to reach Peat Marwick's argument, we first would have to consider par. 19 of the settlement agreement, which provides that the Bankruptcy Court has exclusive jurisdiction in the first instance of "any and all disputes concerning the Settlement Agreement and its enforcement."